IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: **10-CV-20905-Huck-O'Sullivan**

LIL' JOE RECORDS, INC., a Florida corporation,

        Plaintiff,

vs.

DAVID HOBBS a/k/a "Mr. Mixx" and
"DJ Mr. Mixx," ROGER MIZELL,
DETRON BENDROSS, and
EMMANUEL BENDROSS,

        Defendants.
_____/

FILED by *VT* D.C.
ELECTRONIC

**March 23, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

### COMPLAINT

    Plaintiff, Lil' Joe Records, Inc., a Florida corporation ("Lil' Joe"), sues Defendants, David Hobbs a/k/a "Mr. Mixx" and "DJ Mr. Mixx," Roger Mizell, Detron Bendross, and Emmanuel Bendross and alleges:

### Jurisdiction and Venue

    1.    This is an action for trademark infringement under 15 U.S.C. § 1051, et. seq., copyright infringement under 17 U.S.C. § 101, et. seq., and for breach of contract under Florida law.

    2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a).

    3.    This Court has personal jurisdiction over Defendant Hobbs pursuant to, *inter alia*, a consent to jurisdiction included in the subject agreement described below and attached hereto, and over Hobbs, Mizell and Detron Bendross under Fla. Stat. §

48.193(1)(b) and (g) as more fully described herein.  This Court has personal jurisdiction over Emmanuel Bendross because he is believed to reside within the Southern District of Florida.

4.     Venue is proper in this district pursuant to, *inter alia*, the consent to venue included in the subject agreement described below and attached hereto, as well as 28 U.S.C. § 1391(b).

### The Parties

5.     Lil' Joe is a Florida corporation with principal offices in Miami-Dade, County, which is engaged in the business of producing and distributing musical recordings.

6.     Hobbs is believed to be a resident of Georgia, and is engaged in business, national in scope, as a performing artist.

7.     Mizell is believed to be a resident of Colorado and is engaged in business, national in scope, as an agent of Hobbs and others.

8.     Detron Bendross is believed to be a resident of Miami-Dade County, Florida.

9.     Emmanuel Bendross is believed to be a resident of Miami-Dade County, Florida, is a relative of Detron Bendross, and is believed to act as a booking agent.

7274191v1

## Background

10.     Defendants Hobbs and Detron Bendross are former members of the musical performing group *2 Live Crew*.

11.     In or about April 1992, Hobbs relinquished all right, title and interest in the *2 Live Crew* trademark and service marks (the "Marks") to Luke Records, Inc. ("LRI").

12.     Specifically, on or about April 9, 1992, Hobbs and LRI entered into an agreement to settle a dispute pursuant to which Hobbs, *inter alia*, renounced "all claims to the name Two Live Crew, except the ability to refer to himself ... as being 'formerly of Two Live Crew' or words of similar import." See 1992 Agreement, attached hereto as **Exhibit A**.

13.     By Order dated December 8, 1992, this Court retained jurisdiction to enforce the 1992 Agreement.

14.     Thereafter, on or about March 22, 1996, Lil' Joe, through its owner and CEO, Joseph Weinberger, pursuant to a bankruptcy sale, purchased from the bankruptcy estate of LRI all right, title and interest in, *inter alia*, the Marks.  Consequently, Lil' Joe is the owner of the Marks.

15.     In the meantime, in March 1995, Hobbs, along with the other members of the performing group *2 Live Crew,* entered into an Exclusive Recording Agreement (the "1995 Agreement") with Lil' Joe, a copy of which is attached hereto as **Exhibit B**.

16.     Pursuant to the 1995 Agreement, Hobbs specifically agreed that in the event he became disassociated with the performing group *2 Live Crew*, he would cease

all use of the Marks and that he would not promote himself as a former member of *2 Live Crew*.  See ¶ 32(d) of 1995 Agreement.

### Hobbs was previously enjoined from using the Marks

17.     On or about September 1997, Hobbs left the performing group *2 Live Crew*.

18.     Since departing from the group, Hobbs, without permission and/or authorization, has used the Marks in violation of the 1995 Agreement.

19.     In April 1998, in Southern District of Florida Case No. 98-802, U.S. District Judge Donald M. Middlebrooks entered an Order Granting Plaintiffs' Verified Emergency Motion for Preliminary Injunction ("1998 Injunction Order"), enjoining Hobbs from using the Marks, including promoting, marketing, representing himself, or performing as a member or former member of *2 Live Crew*.  See Injunction Order, attached hereto as **Exhibit C**.

20.     Hobbs filed for bankruptcy before the Injunction Order was converted into a Permanent Injunction.

### Bendross was previously enjoined from using the Marks

21.     In December 2006, in Southern District of Florida Case No. 06-21958, U.S. District Judge William M. Hoeveler entered a Permanent Injunction against Bendross and others finding that they had intentionally violated a Temporary Restraining Order prohibiting them from using the Marks.   See Agreed Order Granting Plaintiffs' Motion for Preliminary Injunction ('06 Injunction Order"), attached hereto as **Exhibit D**.

22.     Judge Hoeveler found, *inter alia*, that Bendross and others had unlawfully performed at various clubs using the name *2 Live Crew* and used the Marks on various websites, including various My Space.Com pages.

23.     Accordingly, Judge Hoeveler permanently enjoined Bendross and others from, *inter alia*: a) performing or offering to give any live concert performances using the Marks; and b) advertising, performing or promoting on the internet and elsewhere recorded music or artwork bearing the Marks or infringing Plaintiff's copyrights.

### New Unlawful Activities

#### a.     MySpace/You Tube – Trademark/Copyright Infringements

24.     Lil' Joe has now learned of additional unlawful activities by Defendants.

25.     First, Hobbs has unlawfully used the Marks on his myspace.com/djmrmixx websites, including advertisements stating, "The 2 Live Crew Founding Member DJ Mr. Mixx." See Website Printouts, attached hereto as **Exhibit E**.

26.     Second, Hobbs has unlawfully reproduced, on promotional flyers and YouTube, copyrighted artwork from Plaintiffs' album covers, "As Nasty as They Wanna Be," "Banned in the U.S.A.," "The 2 Live Crew Live in Concert" and "2 Live is What We Are" (collectively "Copyrighted Artwork"). See **Exhibits F, G and H**. The copyrights are registered to Lil' Joe pursuant to, respectively, VA1-129-779, VA1-141-129, VA1-144-202 and VA1-129-759, copies of which are attached hereto as **Exhibits I, J , K and L**.

27.     Hobbs' myspace website also contains music videos, depicted in Exhibit E, that infringe copyrights owned by Lil' Joe as follows (collectively, "Copyrighted Sound Recordings"):

7274191v1

a.   "Shake a Lil' Somethin'," registration no. SR 306-192, a copy of which is attached hereto as **Exhibit M**;

b.   "Hoochie Mama," which is included on the album, "2 Live Crew Goes to the Movies – (explicit version)," registration no. SR 245-408, a copy of which is attached hereto as **Exhibit N**;

c.   "Pop That Pussy," which is included on the album, "Sports Weekend as Nasty as They Wanna Be Part 2," registration no. SR 327-778, a copy of which is attached hereto as **Exhibit O**;

d.   "Face Down Ass Up," which is included on the album, "Banned in the U.S.A.," registration no. SR 327-789, a copy of which is attached hereto as **Exhibit P**; and

e.   "Me So Horny," which is included on the album, "As Nasty as They Wanna Be," registration no. SR 353-540, a copy of which is attached hereto as **Exhibit Q**.

28.   Lil' Joe demanded that Hobbs remove the infringing material from his website, but Hobbs refuses to do so.

### b.   **Live Performances as *2 Live Crew***

29.   Lil' Joe has also discovered that Defendants, in concert with one another, are using the Marks to promote Hobbs and Detron Bendross as "2 Live Crew" at various club performances.

30.   Specifically, Defendants created booking videos prominently displaying the Mark.  See Exhibits G and H, above, and **Exhibit R**.

31.     Defendants are, in concert with one another, booking live performances using the name *2 Live Crew* at various entertainment clubs.  Promotional brochures reflecting this unlawful use of the Marks in connection with Defendants' "Soakin Wet Tour" are attached hereto as **Exhibit S**.

32.     Defendants have unlawfully registered the domain name, "official2livecrew," which further infringes the Marks, and are using that domain name to deceive consumers into believing that they are associated or affiliated with the group when in fact that is no longer the case.

33.     In some instances, Defendants are booking performances, accepting performance fees, and then failing to appear, which has substantially damaged the goodwill and reputation that the Marks have come to represent.

34.     Defendants are representing that they have the full power and authority to use the Marks, despite the plain language of the above-referenced Orders and Agreements.

## COUNT I
## Breach of 1995 Agreement

35.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

36.     Under the 1995 Agreement, Hobbs specifically agreed that in the event he became disassociated with the performing group *2 Live Crew*, he would cease all use of the Marks and that he would not promote himself as a former member of *2 Live Crew*. See ¶ 32(d) of 1995 Agreement.

37.     Hobbs became disassociated with *2 Live Crew* at least 13 years ago.

38.     Hobbs' use of the Marks on his myspace website and in connection with live performances, including promoting himself on literature and otherwise, using the Marks is a clear breach of the 1995 Agreement.

## COUNT II
## TRADEMARK INFRINGEMENT PURSUANT TO 15 U.S.C. § 1114

39.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

40.     Lil' Joe is the owner of U.S. Trademark Registration No. 74653484 for the mark, "The 2 Live Crew," a true and correct copy of which is attached hereto as **Exhibit T**.

41.     Defendants are using in commerce reproductions, counterfeits, copies and/or colorable imitations of the Marks in connection with the sale, offering for sale, distribution, or advertising of goods and services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

42.     Defendants are reproducing, counterfeiting, copying and/or colorably imitating the Marks and applying such reproduction, counterfeit, copy or colorably imitation to labels, signs, prints, packages, wrappers, receptacles and/or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

43.     As a result, Lil' Joe is being damaged, including, without limitation, irreparable harm for which there is no adequate remedy at law.

## COUNT III
## VIOLATION OF PERMANENT INJUNCTION

44.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

45.     The actions of Bendross, described herein, violate the '06 Injunction Order entered by Judge Hoeveler.

46.     Accordingly, Bendross should be ordered to show cause before this Court as to why he should not be held in contempt.

## COUNT IV
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.
(Copyrighted Artwork: "As Nasty as They Wanna Be")

47.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

48.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the artwork from Plaintiffs' album cover, "As Nasty as They Wanna Be" (VA1-129-779).

49.     Defendants had access to the copyrighted work and have reproduced it on Hobbs' myspace.com webpage and on their "Soakin Wet Tour" promotional flyer in violation of Lil' Joe's copyrights.

50.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the "As Nasty as They Wanna Be" Copyrighted Artwork in violation of 17 U.S.C. §101 et. seq.

7274191v1

9

## COUNT V
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.
(Copyrighted Artwork: "Banned in the U.S.A.")

51.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

52.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the artwork from Plaintiffs' album cover, "Banned in the U.S.A." (VA1-141-129).

53.     Defendants had access to the copyrighted work and have reproduced it on their "Soakin Wet Tour" promotional flyer in violation of Lil' Joe's copyrights.

54.     Defendants' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the "Banned in the U.S.A." Copyrighted Artwork in violation of 17 U.S.C. §101 et. seq.

## COUNT VI
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.
(Copyrighted Artwork: "The 2 Live Crew Live in Concert")

55.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

56.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the artwork from Plaintiffs' album cover, "The 2 Live Crew Live in Concert" (VA1-144-202).

57.     Defendants had access to the copyrighted work and have reproduced it on YouTube in violation of Lil' Joe's copyrights.

58.     Defendants' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the "The 2 Live Crew Live in Concert" Copyrighted Artwork in violation of 17 U.S.C. §101 et. seq.

7274191v1

<div align="center">

**COUNT VII**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.**
(Copyrighted Artwork: "2 Live is What We Are")

</div>

59.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

60.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the artwork from Plaintiffs' album cover, "2 Live is What We Are" (VA1-129-759).

61.     Defendants had access to the copyrighted work and have reproduced it on YouTube in violation of Lil' Joe's copyrights.

62.     Defendants' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the "2 Live is What We Are" Copyrighted Artwork in violation of 17 U.S.C. §101 et. seq.

<div align="center">

**COUNT VIII**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.**
("Shake a Lil' Somethin'" sound recording)

</div>

63.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

64.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the sound recording to "Shake a Lil' Somethin'" (SR 306-192).

65.     Hobbs had access to the copyrighted work and has reproduced and publicly displayed it on his myspace.com webpage in violation of Lil' Joe's copyrights.

66.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to sound recording to "Shake a Lil' Somethin'" in violation of 17 U.S.C. §101 et. seq.

## COUNT IX
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.
("Hoochie Mama" sound recording)

67.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

68.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the sound recording to "Hoochie Mama" (SR 245-408).

69.     Hobbs had access to the copyrighted work and has reproduced and publicly displayed it on his myspace.com webpage in violation of Lil' Joe's copyrights.

70.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to sound recording to "Hoochie Mama" in violation of 17 U.S.C. §101 et. seq.

## COUNT X
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.
("Pop That Pussy" sound recording)

71.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

72.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the sound recording to "Pop That Pussy" (SR 327-778).

73.     Hobbs had access to the copyrighted work and has reproduced and publicly displayed it on his myspace.com webpage in violation of Lil' Joe's copyrights.

74.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the sound recording to "Pop That Pussy" in violation of 17 U.S.C. §101 et. seq.

**COUNT XI**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.**
("Face Down Ass Up" sound recording)

75.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

76.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the sound recording to "Face Down Ass Up" (SR 327-789).

77.     Hobbs had access to the copyrighted work and has reproduced and publicly displayed it on his myspace.com webpage in violation of Lil' Joe's copyrights.

78.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to sound recording to "Face Down Ass Up" in violation of 17 U.S.C. §101 et. seq.

**COUNT XII**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, ET. SEQ.**
("Me So Horny" sound recording)

79.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

80.     Lil' Joe is the owner of a valid registration issued by the U.S. Copyright Office for the sound recording to "Me So Horny" (SR 353-540).

81.     Hobbs had access to the copyrighted work and has reproduced and publicly displayed it on his myspace.com webpage in violation of Lil' Joe's copyrights.

82.     Hobbs' conduct constitutes infringement, including deliberate and willful infringement, of Lil' Joe's copyright in and to the sound recording to "Me So Horny" in violation of 17 U.S.C. §101 et. seq.

**COUNT XIII**
**UNFAIR COMPETITION UNDER FLORIDA LAW**

83.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

7274191v1

84.     Defendants' conduct described herein constitutes unfair competition under Florida law.

85.     Defendants' conduct is willful and intentional, and has caused and is continuing to cause irreparable harm for which there is no adequate remedy at law.

## COUNT XIV
## DECEPTIVE AND UNFAIR TRADE PRACTICES UNDER FLA. STAT. § 501.201

86.     Lil' Joe realleges paragraphs 1-34 as though set forth in full herein.

87.     This is an action under the Florida Deceptive and Unfair Trade Practices Act, Florida Statute, §501.201, et seq.

88.     Defendants' actions described herein were calculated to deceive and actually did deceive the public into mistakenly believing that Defendants were affiliated, connected or associated with the Marks or that Defendants' services originated with or were sponsored by or approved by Lil' Joe.

89.     As such, Defendants intentionally engaged and continue to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Fla. Stat. § 501.204.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Lil' Joe, prays that the Court award the following relief:

A.     Permanently enjoining Defendants and all persons or entities in active concert or participation with any of them, from using, displaying, advertising or selling their services under, or otherwise doing business or holding themselves out to the public as, "2 Live Crew," "Two Live Crew," "formerly of 2 Live Crew," or any formative

7274191v1

variations thereof, and any mark confusingly similar thereto (collectively the "*2 Live Crew* Marks");

B.    Permanently enjoining Defendants from performing or offering to perform any live performance using the *2 Live Crew* Marks;

C.    Permanently enjoining Defendants from advertising, performing, promoting, offering to sell, distributing, or transferring any items of recorded music or artwork bearing the *2 Live Crew* Marks, whether on the internet or otherwise;

D.    Permanently enjoining Defendants from using the *2 Live Crew* Marks on the internet, including on Defendants' myspace.com websites and on You Tube, and transferring the www.official2livecrew.com domain name registration to Plaintiff;

E.    Order Defendants to deliver up to Plaintiff for destruction all documents and materials, including flyers and brochures, bearing the *2 Live Crew* Marks in accordance with 15 U.S.C. § 1118;

F.    Order Defendants to remove from their website all links to music or video that infringes Lil' Joe's Copyrighted Copyrighted Artwork and Sound Recordings;

G.    Permanently enjoining and restraining Defendants from copying, reproducing, duplicating, disseminating, distributing, promoting, selling, manufacturing or otherwise using any unauthorized copies of or derivative works based upon Lil' Joe's Copyrighted Artwork and Copyrighted Sound Recordings;

H.    Impounding and ordering destroyed all advertisements, promotional materials, brochures, websites, photographs and documents depicting Lil' Joe's Copyrighted Artwork and Copyrighted Sound Recordings pursuant to 17 U.S.C. § 503;

I.    Ordering Defendants to account for and pay to Lil' Joe all of their profits

derived from copying, reproducing, duplicating, disseminating, distributing, promoting, selling and/or otherwise using and making derivative works from the Copyrighted Artwork and Copyrighted Sound Recordings, including profits earned as a result of concerts or other performances using materials bearing the Copyrighted Artwork or Copyrighted Sound Recordings pursuant to 17 U.S.C. § 504;

      J.      Awarding Lil' Joe damages, including statutory damages, under 17 U.S.C. § 504;

      K.      Awarding Lil' Joe attorneys' fees and costs under 17 U.S.C. § 505;

      L.      Order Defendants to pay Lil' Joe monetary relief under 15 U.S.C. § 1117(a) in an amount equal to the Defendants' profits plus damages sustained by Lil' Joe, including treble damages, plus the cost of this action, including attorneys' fees pursuant to 15 U.S.C. § 1117(a) and Fla. Stat. § 501.211;

      M.      Find that this case is exceptional pursuant to 15 U.S.C. §§ 1117(a) and 1125(c), and treble any damages awarded to Lil' Joe due to Defendants' willful and intentional acts of trademark infringement and unfair competition;

      N.      Order an accounting and damages to Lil' Joe; and

      O.      Such other relief as this Court deems is just and proper.

Dated: March _23_, 2010.

Respectfully submitted,

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Lil' Joe
200 East Broward Boulevard
P.O. Box 1900
Ft. Lauderdale, Florida 33302
Phone: (954) 527-2492
Fax:    (954) 333-4092

By:

Matthew S. Nelles
Florida Bar No. 009245

# EXHIBIT A

MAY 04 '92 13:31                                                                          P.3



8400 NORTHEAST 2ND AVENUE · MIAMI FLORIDA 33138
TELEPHONE (305) 757-1969 · FAX (305) 757-5656

April 9, 1992

Via Fax And Express Mail

310-286-0824

Mark L. Levinson, Esq.
Sklar, Coben, Levinson & Dornstein, Inc
Suite 1700
2029 Century Park East
Los Angeles, California 90067

RE:   DAVID HOBBS vs. LUKE RECORDS, ET AL.

Dear Mark:

        In order to settle the above-referenced suits and in order to
buy out all future publishing and songwriter royalties, I wish to
outline the settlement that we are prepared to make which when
signed in counterpart by both David Hobbs and Luther Campbell will
constitute the framework for more formal settlement documents to be
drafted, signed by the parties, filed and approved by the court on
an expedited basis:

        1.   David Hobbs will receive the sum of One Hundred Sixty-
Five Thousand ($165,000) Dollars.

        2.   In addition, we will arrange for his car to be fully paid
off.   David will have the responsibility to place the Florida
registration and insurance in his sole name, and shipped to him in
Oakland, California.   This will occur once a settlement has been
signed.   We will advance the monies and subtract them from the
monies due in number 1.

        3.   The monetary portion of the settlement will be paid
directly by Atlantic Records or such other distributor of our
products and will be paid as follows:

        a.   The sum of Ninety Two Thousand ($92,000) Dollars
immediately.   In addition to this sum we will include an Eight
Thousand Dollar payment to Alfred Sapse, Esq. in settlement of past
legal bills in exchange for which Mr. Sapse will use his best
efforts to have Mr. Hobbs receive a dismissal, with prejudice, in
connection with the Macola Record Company lawsuit.   In the event
that Mr. Hobbs is not dismissed from said lawsuit, then Mr. Hobbs
will be responsible to obtain his own attorney.

        b.   The balance of approximately Sixty Five Thousand
($65,000) Dollars will be paid by Atlantic Records or our other

                * upon our irrevocable instructions

**EXHIBIT 2**

EXHIBIT "A" (consisting of 3 pages)

*(or than his public performance receipts)*

distributor in six (6) monthly installments commencing one month after the initial payment.

4.    David Hobbs and any corporation or entity he has an interest in will release Luke Records et al. from any further obligation to pay royalties to him as a result of his publishing, producing, performing or songwriting services in connection with Two Live Crew or any other artist on the Luke Records or Effect Records labels or any other label which Luke controlled in the past.  It is contemplated that Mr. Hobbs will also assign his right to any monies he is to receive from Two Live Music from Two Live Crew Records.

5.    David Hobbs will renounce all claims to the name Two Live Crew, except the ability to refer to himself, however and whenever he chooses, as being "formerly of Two Live Crew" or words of similar import.  However, such reference shall appear in small type after the first album he releases.  He may use large type on the first LP.

6.    Luke Records will provide Mr. Hobbs with a letter stating that he is free to perform as a recording Artist (it being understood that he has always had the right to perform as a producer) for any and all third parties.

7.    Mr. Hobbs will retain all rights to the name "Mr. Mixx" and Luke Records will never utilize that name except with regard to the Two Live Crew Records or other Records produced by Mr. Hobbs.

8.    Except as provided for herein, Luke Records will indemnify and agree to hold David Hobbs safe and harmless from all claims, past, present or future, arising as a result of Mr. Hobbs performing, writing, appearing, or producing, as a member of Two Live Crew.

9.    Mr. Hobbs will sign a dismissal with prejudice to all lawsuits in which he is a party and a settlement agreement will be filed and approved by the court. Each party will bear its own costs.  Further, the stipulation will provide for enforcement rights with attorney's fee provisions to the prevailing party.

Kindly have Mr. Hobbs sign this letter where indicated and I will have Mr. Campbell sign where indicated and we will exchange signed counterparts immediately by fax and overnight mail.

** Notwithstanding the foregoing, the dismissal will be held in escrow by our attorney until such time as the payment referred to in Paragraph 3(a) above is received by Mr. Hobbs. At which time if Mr. Hobbs secures a Confession of judgment which may be filed and acted upon shall there be a failure of any partial payments required under Paragraph 3(a) ...

04-02-1998 01:25PM

Thereafter, more formal settlement papers and all other papers needed in order to effectuate the foregoing will be prepared for execution and filing with the court.

Sincerely,

Joseph Weinberger

Accepted and Agreed To:

David Hobbs

Accepted and Agreed To:

Luther Campbell on behalf of himself and his related entities

cc: Nic Manaini, Esq.

# EXHIBIT B

This Agreement made and entered into as of this 16th day of March, 1995, by and between LIL' JOE RECORDS, INC., of, 19510 East Oakmont Drive, Miami, Florida (referred to as "COMPANY") and David P. Hobbs p/k/a Mr. Mixx, 935 Second Avenue, Pinole, California 94564, Mark Ross p/k/a Brother Marquis 537 Rays Road, Stone Mountain, Georgia 30088 and Christopher Wong Won p/k/a Fresh Kid Ice 901 NW 203rd Avenue, Miami, FL collectively known as The 2 Live Crew)(referred to as "ARTIST" or you).

In consideration of the mutual promises contained herein, it is hereby agreed as follows:

1. (a) COMPANY hereby engages ARTIST to record for COMPANY masters embodying the performances of ARTIST, and ARTIST hereby accepts such engagement and agrees to record masters embodying the performances of ARTIST exclusively for COMPANY during the term hereof and all extensions and renewals. COMPANY shall have an option of first right of refusal for each member of ARTIST to release a solo project on COMPANY's label. Company shall have a 15 business day matching right for all solo recording projects of each member of ARTIST.

(b) The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2. The term of this Agreement shall be for a period of one (1) year commencing on the date hereof ("Initial Period"). ARTIST hereby grants to COMPANY four (4) consecutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth. The Initial Period and every Option Period for which COMPANY has exercised its option are hereinafter sometimes referred to together as the "Term". Each option shall be automatically exercised, unless written notice to the contrary is sent to ARTIST at least fifteen (15) days prior to the date that the Term would otherwise expire.

3. During the Initial Period, ARTIST shall record masters the equivalent in playing time of one Lp. Said masters are herein and hereby owned by COMPANY pursuant to all of the terms and conditions of this Agreement, particularly paragraph 20 hereof and said masters shall be deemed recorded and delivered hereunder during the Initial term.

4. (a) During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY for distribution in the Territory and ARTIST shall not authorize the use of ARTIST's name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records for anyone other than COMPANY in the Territory. It is agreed however, that ARTIST may perform as instrumentalists, arrangers, producers or background singers on other recordings for other artists in a "sideman" capacity provided COMPANY receives credit, in the form of "Courtesy of Lil' Joe Records". However, each of the members of The 2 Live Crew may perform as a solo artist for any other label

1

(b) ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY for distribution in the Territory (i) for a period of five (5) years after the initial date of release of the respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this Agreement, whichever is later ("Re-recording Restriction").

(c) Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Rerecording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory. ARTIST shall furnish COMPANY a copy of the provisions of any such contract relating to the foregoing.

5.   All masters recorded by ARTIST during the Term from the inception of the recording thereof and all reproductions derived therefrom, together with the performances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by ARTIST or any person deriving any rights or interests from ARTIST. Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the world:

(a) To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose in any or all fields of use by any method now or hereafter known, records embodying the masters recorded by ARTIST during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom;

(b) To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore, or hereafter adopted by ARTIST), approved photographs, approved likeness, and approved biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST and all Pictures produced during the Term; ARTIST consent will be requested, such consent may not be unreasonably withheld.

(c) To obtain copyrights and renewals thereof in sound recordings (as distinguished) from the musical compositions embodied thereon) recorded by ARTIST during the Term in COMPANY's name as owner and employer-for-hire of such sound recordings;

(d) To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect. COMPANY agrees that the initial United States release

2

Case 1:98-cv-00802-DMM   Document 1   Entered on FLSD Docket 04/13/1998   Page 51 of 76

during the term hereof. Records solely embodying masters recorded hereunder shall be in COMPANY's sole discretion.

To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known .

6.  (a) ARTIST acknowledges that the sale of records is speculative and agrees that the judgement of COMPANY with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon ARTIST. Except as otherwise specifically set forth in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make sell, license, or distribute records manufactured from masters delivered hereunder.

(b)  Provided that ARTIST is not in breach of any material terms of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercially satisfactory masters sufficient to comprise each newly-recorded LP hereunder embodying ARTIST's studio performances of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefore, COMPANY agrees to commercially release each LP recorded and delivered hereunder within one hundred and twenty (120) days following completion of Artists recording for COMPANY in the United States and make a best efforts basis to release same commercially in such foreign markets that the Company has licensees for. COMPANY warrants that its current distribution agreement provides that its distributor is not required to distribute any record if its distributor in its reasonable good faith discretion, believes that the artistic, musical, or literary content of any of COMPANY's records are either not commercially satisfactory or may be patently offensive. violate (or advocate the violation of) any law or statute, infringe upon the rights of any person or entity or subject its distributor to liability for any reason may withhold or withdraw the LP from distribution.

(c)  It is understood and agreed that if COMPANY shall have failed to so release any such LP, singles or videos, ARTIST shall have the right to notify COMPANY in writing of COMPANY's such failure and of ARTIST's desire that the Term of this Agreement be terminated if COMPANY does not, within sixty (60) days after COMPANY receives such notice from ARTIST commercially release the applicable LP in the United States. It is specifically understood and agreed that if COMPANY shall have no liability whatsoever to ARTIST and ARTIST's only remedy shall be to terminate the Term of this Agreement by written notice to COMPANY within fifteen (15) days following the expiration of such sixty (60) day period.

7.  A recoupable advance of Twenty thousand dollars paid to each member of ARTIST payable 50% upon execution of the contract with the remaining 50% upon final mixing of the completed LP. Each member of ARTIST shall receive the same advances in the same manner for each overcall LP and each subsequent LP. Each advance hereunder shall be chargeable 2/3 to record royalties and one third to mechanical royalties as a publishing advance provided in

3

paragraph 14.

Each LP delivered hereunder shall have a minimum of 12 single masters. Upon the Lp obtaining sales of the following royalty units (sales less free goods) in which company has been paid (within 7 days of company receiving payment therefor) additional advances shall be paid to each member as follows:

| LP royalty units sold | Advance to each member |
|---|---|
| 100,000 | |
| 150,000 | |
| 200,000 | REDACTED FOR PROPRIETORY REASONS |
| 300,000 | |
| 400,000 | |
| 500,000 | |
| 750,000 | |
| 1,000,000 | |

The additional advances paid hereunder shall be paid to each member of ARTIST within 10 days of Company's being paid for such sales.

8. (a) (i)   Except as otherwise provided in paragraph 7 and subparagraph 8(a)(ii) hereof, COMPANY shall be solely responsible for and shall pay all recording costs, and promotional costs incurred in the production and release of all masters subject to this Agreement. All such costs paid by COMPANY shall be deducted from any and all record royalties becoming payable to ARTIST under this agreement unless the ARTIST or any member intentionally misses a video shoot or breaches any of the material terms of this agreement and in such case only the particular members(s) will be charged.

(ii)   Notwithstanding the provisions of subparagraph 9(a)(i)hereof in the event that Company elects to require ARTIST to record and deliver the additional masters delivered pursuant to this Agreement, or if COMPANY wishes to re-mix any of the master delivery in connection with the first LP, all costs so paid by COMPANY shall be advances against and Recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this Agreement.

(b)   COMPANY shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other approved parties who have rendered services or otherwise in respect of sales of recording derived from masters subject to this Agreement.

9. (a)   Each master recorded and delivered hereunder shall be produced by a producer mutually selected by ARTIST and COMPANY.

10. Conditioned upon ARTIST's full and faithful performance of all the material terms hereof, COMPANY shall pay ARTIST the following royalties in respect of records subject to

4

this Agreement which r s shall include the producers royalty.

     (a) Company shall credit Artist's Royalty Account pursuant to and in accordance with the following royalty schedule for records manufactured and sold in the United States:

| RECORDING PERIODS | MINIMUM SIDES | ROYALTY RATES |
|---|---|---|
| Initial Period | One LP | |
| 1st Option Period | One LP | REDACTED FOR PROPRIETORY REASONS |
| 2nd Option Period | One LP | |
| 3rd Option Period | One LP | |
| 4th Option Period | One LP | |

     *Royalty Rate - Percentage times one hundred (100% percent of net records sold and for which COMPANY has been paid times the retail price of records manufactured in the United States. This rate shall also apply to 7" or 12" Singles. (In the event Company's distributor pays on the basis of eighty five (85%) or ninety (90%) percent of retail, then company shall pay on the same basis as it is paid by its distributor).

In the event any LP sells 500,000 or 1,000,000 royalty units as the case may be then the royalty shall be prospectively increased on such LP's sales for example by 1% or 2% in case sales reach 1 million royalty units during the initial contract period to 14%. The highest level obtained on an LP shall be the level the next Lp shall commence at.

     (b) (i)  With respect to retail sales outside the United States of all records derived from masters recorded and delivered during the Term, the royalty rate shall be based upon the U.S. rate and prorated at the percentage which COMPANY's royalty rate is reduced with a most favored nations royalty paid for each territory as received by COMPANY for said territory.

     (ii) The royalty rate hereinafter set forth in subparagraph 10(b)(i) shall be hereinafter referred to as the "Basic Foreign Rate."

     (iii) Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittance to the United States in respect of records sold in such territory(ies) shall equal the lesser of (A) the Basic Foreign Rate or (B) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to two (2%) percent of the retail list price and such monies as Company or its licensees shall be required to pay to all applicable union funds in respect of said sales.

     (iv)  Royalties in respect of sales of records outside the United States shall

5

be computed in the same national currency as COMPANY is accounted to by its licensees and shall be paid to ARTIST at the same rate of exchange as COMPANY is paid. It is understood that such royalties will not be due and payable until payment thereof is received by or credited to COMPANY in the United States pursuant to governmental regulations, royalties therefore shall not be credited to ARTIST's account during the continuance of such inability except that (i) if any accounting rendered to ARTIST hereunder during the continuance of such inability shows ARTIST's account to be in a credit position, COMPANY will, after ARTIST's request and at ARTIST's expense, if COMPANY is able to do so, deposit such royalties to ARTIST's credit in the applicable foreign currency in a foreign depository, or (ii) if the royalties credited to ARTIST's account exceed the Amount, if any, by which ARTIST's account is in a debit position, then COMPANY will, after ARTIST's request and at ARTIST's expense, and if COMPANY is able to do so, deposit such excess royalties to ARTIST's crediting the applicable foreign currency in a foreign depository. Deposit as aforesaid shall fulfill COMPANY's obligations under this Agreement as to record sales to which such royalty payments are applicable.

(c)   With respect of records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television or (iii) by any combination of the methods set forth above, the royalty payable in connection therewith shall be one half (1/2) of COMPANY's net earned royalty receipts in respect of reported sales through such channels after COMPANY shall have first deducted all third party payments for which COMPANY is responsible. No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation.

(d) (i)  With respect to mid-priced LPs, the royalty rate shall be two thirds (2/3) of the Basic U.S. LP rate or Basic Foreign Rate, as the case may be, provided  that during the Term, COMPANY shall not release in the United States any such midpriced LP comprised solely of masters delivered hereunder prior to twelve (12) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent in writing.

(ii) With respect to budget LPs, the royalty rate shall be one-half of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, provided that during the Term, COMPANY shall not release in the United States any such budget LP comprised solely of masters delivered hereunder prior to eighteen (18) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent thereto.

(e)  With respect to EPs, the royalty rate shall be three-fourths (3/4) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

6

(f) Notwit⸺ anding anything to the contrary con⸺ ed in this Agreement, in the event that Company (or its licensee(s)) shall in any country(ies) of the Territory adopt a policy applicable to the majority of LPs in COMPANY's (or its licensee(s);) then current catalogue pursuant to which the retail list price of an LP is reduced subsequent to its initial release, then the royalty rates otherwise payable to ARTIST under this Agreement shall be reduced in the proportion that such reduced retail list price of the applicable LP bears to the retail list price of such LP as initially released in the applicable country.

(g) With respect to "compact-disc" LPs, the royalty rate shall be the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be. In the event other formats not mentioned herein are released then the royalty rate and deductions shall be the same as for "compact discs".

(h) In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, ARTIST shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be. For the purposes of calculating royalties payable in connection with such sales, the retail list price of such "records"" shall be deemed to be the then-current retail list price of tape copies of such records and in the case of records which have no tape equivalent, the corresponding price of the disc (but not in the United States, eighty-five (85%) percent of the then current retail list price of such tape copies or corresponding disc), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(s)(iii) of this Agreement.

(i) The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be three quarters (3/4) of the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price applicable of such records).

(j) The royalty rate payable for records sold as "premiums" shall be one half (1/2) of the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, and the retail list price for such records shall be deemed to be COMPANY's actual sales price. It is understood that COMPANY shall not use ARTIST's name or likeness in connection with any such premium record as an endorsement of any product or service.

(k) The royalty rate payable for records sold in the form of pre-recorded tape (whether reel-to-reel or cartridge) or any other form (other than disc), shall be the applicable royalty rate otherwise payable, provided that if the retail list price of any record sold in pre-recorded tape form or any form other than disc) shall be less than the retail list price of the corresponding record in disc form, the royalty rate otherwise payable shall be reduced in the proportion that the retail list price of the applicable record in pre-recorded tape form (or such form other than disc) bears to the retail list price of such record in disc form.

(1) COMPANY shall have the right to license the masters to third parties for

7

record use and/or all oth(   ypes of use on a flat-fee basis. CON   \NY shall credit ARTIST's royalty account with fifty (50%) percent of the net amount received by COMPANY or credited to COMPANY under each such license after COMPANY shall have first deducted all third party payments for which COMPANY is responsible.

(m) As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to ARTIST hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivery hereunder embodies on such record and the denominator of which is the total number of royalty bearing masters embodied thereon.

(n) As to masters embodying performances of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to sales of any record derived from any such master and the recording cost and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master.

(o) COMPANY shall have the right to include or to license others to include any one or more of the masters in promotional records on which such masters and other recordings are included, which promotional records are designed for sale at a substantially lower price than the regular price of COMPANY's LPs. No royalties shall be payable on sales of such promotional records unless COMPANY receives a royalty.

(p) No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops". rack jobbers. distributors or dealers, whether or not affiliated with COMPANY. provided that such records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1.000 LPs distributed, and provided further that COMPANY shall have the right to exceed the aforesaid limitations for short term special promotions or marketing campaigns. The number of records distributed on a no-charge basis shall not, for any such short term promotion or   exceed an additional ten (10%) percent of the total number of records distributed. COMPANY shall use reasonable efforts to notify ARTIST of any such short term special promotion or campaign, but COMPANY's failure to do so shall not be a breach of this Agreement or in any manner affect COMPANY's right to distribute records on a non-royalty basis as aforesaid; (ii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewer, radio and television stations and networks, motion pictures companies. music publishers, COMPANY's employees, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (iii) records sold as scrap, salvage, overstock or "cut-outs" which will not occur on albums for the first 24 months from release; (iv) records sold below cost. No royalties shall be payable on any sales by COMPANY's licensees until payment has been received by or credited to COMPANY in the United States. This paragraph shall be governed by the agreement between COMPANY

and it's distributor. In th(   /ent that distributor adopts a differe   policy as to the contents of this paragraph, then said distributor's policy shall prevail as between COMPANY and ARTIST in calculating all royalties payable first.

(q)  As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, not affiliated with COMPANY, in lieu of the records given away or furnished on a "no-charge" basis as provided in sub-paragraph 10(p)(i) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price, provided that said reduction in the applicable royalty rate does not exceed the percentage limitation set forth in subparagraph 10(p)(i) above.

(r)  The royalty rate provided for in this Paragraph 10 shall be applied against the retail list price (less COMPANY's container deductions, excise taxes, duties and other applicable taxes) for one hundred (100%) of records sold which are paid for and not returned. The term "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufactures suggested retail price in the country of manufacture or sale, as COMPANY is paid. In those countries where a manufacturer's suggested retail price is not utilized or permitted, the generally accepted retail price shall be utilized. With respect to "compact-disc" or other audio-file records in any configuration manufactured, distributed and sold by Company's normal retail channels in the United States a royalty equal at the same penny rate as Company is paid on cassette tapes. In computing sales, COMPANY shall have the right to deduct all returns made at any time and for any reason. In the event COMPANY is paid on the basis of 100% of the retail list price then ARTIST will be paid on the same basis.

(s)  COMPANY's container deductions shall be a sum equal to (i) ten (10%) percent of the retail list price for records in disc form (other than "compact-disc" records), (ii) twelve and one-half (12-1/2%) percent of the retail list price for records in disc form (other than "compact disc" records), (ii) twelve and one-half (12-1/2%) of retail list price for records in disc form in "double-fold" jackets or covers or in jackets which contain an insert or any other special elements, and (iii) twenty (20%) percent of the retail list price for pre-recorded tape, "compact-discs" and cartridge boxes or containers, or any other form of package, container or box other than as described herein. In the event that the deduction for packaging charged by COMPANY's distributor is different than the amounts herein, then the amount deducted by COMPANY's distributor shall prevail.

11.  Statements as to royalties payable hereunder shall be sent by COMPANY to ARTIST within sixty (60) days after the expiration of each semiannual period for the preceding semiannual period ending June 30 and December 31. Concurrently with the rendition of each statement, COMPANY shall pay ARTIST all royalties shown to be due by such statement, after deducting all recording costs paid by COMPANY, all payments made on behalf of ARTIST and all advances made to ARTIST prior to the rendition of the statement. No

9

statements need be rendered by COMPANY for any such miannual period after the expiration of the Term hereof for which there are not sales of records derived from masters hereunder. All payments shall be made to the order of ARTIST and shall be sent to ARTIST at ARTIST's address first above written. COMPANY shall be entitled to maintain a single account with respect to all recordings subject to this agreement between the parties hereto. COMPANY may maintain reserves, however, COMPANY agrees that regarding such reserves: (i) with respect to LPs in disc form, each base reserve as initially established shall not exceed twenty five (25%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to five (5%) percent; (ii) with respect to LPs in tape form, each base reserve as initially established shall not exceed twenty-five (25%) percent of tapes shipped during the applicable accounting period and shall at the end of two (2) years from the date established, be reduced to ten (10%) percent; and (iii) with respect to Singles, each base reserve as initially established shall not exceed thirty-five (35%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent. COMPANY shall fully liquidate each base reserve within two (2) years from the date that such base reserve was established in equal parts every four accounting periods. At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated. ARTIST shall be deemed to have consented to all accounting rendered by COMPANY hereunder and said accounting shall be binding upon ARTIST and not subject to any objection by ARTIST for any reason unless specific objection, in writing, stating the basis thereof, is given to COMPANY within one (1) year after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which COMPANY notifies ARTIST that it denies the validity of the objection. No recoupment shall occur after the close of an accounting period but before a statement is issued except in the case of settlement of a lawsuit or a sample claim.

12. ARTIST shall have the right at ARTIST's sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of COMPANY to examine COMPANY's books and records as same pertain to sales of records subject hereto as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at COMPANY's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

13. (a) All notices to ARTIST may be served upon a principal or officer of ARTIST personally, by prepaid telegram, or by depositing the same, postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to ARTIST at ARTIST's address first above written. A copy shall also be sent for Mark Ross' attorney to: Jess L. Rosen, Esq. Kate, Smith & Cohen Ivy Place, 3423 Piedmont Road NE, 2nd Floor, Atlanta, GA 30305.

(b) All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's

address first above writt(   .nd by regular mail with a simultan(   s fax copy sent in the same manner to:

Joseph Weinberger, Esq.
305-829-3938

14. (a) All musical compositions or material recorded pursuant to this Agreement no matter who is the writer amongst ARTIST of the particular musical composition or material recorded which are owned, written or composed, in whole or in part by ARTIST or any producer of the masters subject hereto, or which are owned, written or controlled, directly or indirectly, in whole or in part, by ARTIST and/or any producer of the masters subject hereto (herein called "Controlled Compositions") shall be and are hereby licensed to COMPANY for the United States at a royalty per selection equal to seventy-five (75%) percent of the minimum statutory per selection rate (without regard to playing time) effective on the date of first commercial release. The aforesaid seventy-five (75%) percent per selection rate shall hereinafter sometimes be referred to as the "Per Selection Rate." Notwithstanding the foregoing, the maximum aggregate mechanical royalty rate which COMPANY shall be required to pay in respect of any Single. Disco-single or LP here under, regardless of the total number of all compositions contained therein, shall not exceed two (2) times, and ten (10) times the Per Selection Rate (for CD's up to 11 times), respectively and in respect of any EP hereunder five times, regardless of the total number of all compositions contained thereon, shall not exceed the per Selection Rate times the tot~l number of masters contained therein. In this connection, it is specifically understood that in the event that any Single, Disco-Single, EP or LP contains other compositions in addition to the Controlled Compositions (compositions owned, written or controlled in whole or in part by the artist) and the aggregate mechanical royalty rate provided in this Paragraph 14, the aggregate rate for the Controlled Compositions contained thereon shall be reduced by the aforesaid excess over said applicable rate. All mechanical royalties payable hereunder shall be paid on the basis of net records sold hereunder for which royalties are payable to ARTIST pursuant to this Agreement. Notwithstanding anything to the contrary contained herein. mechanical royalties payable in respect to Controlled Compositions for sales of records for any use other than as described in subparagraphs 10(a) and (e) hereof shall be seventy-five (75 %) percent of the otherwise applicable Per Selection Rate controlled Compositions with rearranged versions of any musical compositions in the public domain, when furnished by ARTIST for recording hereunder, shall be free of administration of copyright and of any royalty and any such Controlled Composition shall be made subject to the provisions hereof; and any inconsistencies between the terms of this Agreement and mechanical licenses issued to and accepted by COMPANY shall be determined by the terms of this Agreement. If any Single, Disco-Single, EP or LP contains other compositions in addition to the Controlled Compositions, ARTIST will obtain for COMPANY's benefit mechanical licenses covering such composition on the same terms and conditions applicable to Controlled Compositions pursuant to this Paragraph 14. Notwithstanding the foregoing the 75% rate shall be prospectively increased to 87.5~0 for sales over 1 million royalty bearing units and the applicable provisions of paragraph 7 shall apply.

11

(b) In resp    of all Controlled Compositions perf    ed in Pictures, COMPANY is hereby granted an irrevocable perpetual worldwide license to record and reproduce such Compositions in such Pictures and to distribute and perform such Pictures including, but not limited to, all Videoshows thereof, and to authorize others to do so. COMPANY will not be required to make any payment in connection with those uses, and that license shall apply whether or not COMPANY received any payment in connection with those Pictures. Simultaneously with ARTIST'S submission to COMPANY of the information required pursuant to subparagraph 21(c) (i) hereof. ARTIST shall furnish COMPANY with a written acknowledgement from the person(s) or entity(ies) controlling the copyright in each non-Controlled Compositions to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) to forthwith issue to COMPANY (and its designees) licenses containing said terms and such other terms and conditions as COMPANY (or its designees) may require. Royalties in connection with licenses for the use of non-Controlled Compositions pertaining to Pictures and Videoshows are included in the royalties set forth in subparagraph 21(d) hereof, as described in subparagraph 2l(d)(ii). If the copyright in any Controlled Composition is owned or controlled by anyone else, ARTIST will cause that person, firm or corporation to grant COMPANY the same rights described in this Paragraph 14, on the same terms. Except however, video royalties will be paid to ARTIST if COMPANY receives a royalty and the royalty will be prorated by multiplying the rate herein by a fraction the numerator of which is the royalty rate COMPANY actually receives or is credited with and the denominator is the royalty rate provided for herein.

15. (a) In the event that ARTIST for any reason , except for c below, fails to timely fulfill any of its production and delivery commitments hereunder in accordance with any of the material terms and conditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to ARTIST as to unrecorded or undelivered masters, (ii) to reduce the minimum number of masters required to be recorded and delivered during the then current Period to the number which have been timely recorded and delivered during such period, or (iii) to suspend the term of this agreement during the term of such default. It is specifically understood that COMPANY may exercise any or all of its rights pursuant to subparagraphs 15(a)(i), (ii) and (iii) hereof at any time(s) prior to the date the Term would otherwise expire. COMPANY's obligations hereunder shall be suspended for the duration of any such default. The provisions of this subparagraph shall not result in an extension of the Term for a period in excess of enforcement of personal services agreements. In the event any member of ARTIST or ARTIST files for bankruptcy, then this contract will be listed and shall be reaffirmed in the bankruptcy. In the event that the contract is not reaffirmed than any unearned monies received pursuant to this contract shall be deemed to be nondischargeable and then artist shall forfeit any remaining royalties due hereunder.

(b) Upon reasonable notice from COMPANY, each member of ARTIST, after taking into account his other business commitments knowing release of the album will attempt to not have his other outside business interfere with the promotional activities herein and shall

be available for and shall assist COMPANY with all forms promotion such as but not limited to in store, radio and trade interviews. The parties acknowledge that this provision is a material provision of this agreement.

(c) COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if for by reason of any such contingency, it is materially hampered in their performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable: Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's or ARTIST's control.

(d) If ARTIST's voice should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability solely in connection with undelivered masters.

16. ARTIST expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury. ARTIST expressly agrees that COMPANY shall be entitled to seek injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST which relief shall be in addition to any other rights or remedies. for damages or otherwise available to COMPANY.

17. (a) ARTIST and COMPANY warrants and represents that ARTIST and COMPANY, as the case may be, is not under any disability, restriction or prohibition, whether contractual or otherwise. with respect to ARTIST's or COMPANY's, as the case may be, right to execute this Agreement or ARTIST's or COMPANY', as the case may be, right to perform its terms and conditions. Without limiting the foregoing, ARTIST or COMPANY, as the case may be, specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST or COMPANY, as the case may be, will interfere in any manner with the complete performance of this Agreement by COMPANY or ARTIST. as the case may be, ARTIST or COMPANY, as the case may be, with ARTIST's right to record any and all selections hereunder. ARTIST warrants and represents that there are not in existence any prior unrealized masters embodying ARTIST's performances.

(b) ARTIST warrants and represents that no materials, or any use thereof will violate any law or infringe upon or violate the rights of any third party. "Materials", as used in this subparagraph 17(b) shall include: (i) all musical compositions and other material controlled on masters subject hereto, (ii) each name used by ARTIST, in connection with masters recorded hereunder, and (iii) all other material, ideas, other intellectual properties, or elements

13

Case 1:98-cv-00802-DMM   Document 1   Entered on FLSD Docket 04/13/1998   Page 62 of 76

furnished or selected by ARTIST and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

        (c) ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorney's fees)arising out of, connected with or as a result of any inconsistency with, failure or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party, reduced to final judgement, in connection with the foregoing. In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to ARTIST under this agreement between the partes hereto a sum(s) equal to such loss, and reasonable attorney's fees). COMPANY shall give ARTIST notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST's own choice and at ARTIST's expense. Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement between the parties hereto in any amount consistent with such claim. Except however, if ARTIST shall obtain and post an undertaking (surety bond) in an amount which is in a form suitable to COMPANY and in an amount which COMPANY in its sole judgement deems reasonably sufficient to secure COMPANY for ARTISTS liabilities hereunder. However, if no such proceeding or action for recovery on such claim has commenced within 12 months after its assertion, COMPANY shall release such monies unless COMPANY believes in its sole business judgment that such proceeding may be instituted notwithstanding the passage of that time.

    18.  Wherever in this Agreement ARTIST's approval or consent is required, such approval or consent shall not be unreasonably withheld. COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought. ARTIST shall give COMPANY written notice of approval or disapproval within five (5) business days after such notice. ARTIST shall not hinder nor delay the scheduled release of any record hereunder. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

    19. During the Term, ARTIST warrants and represents that ARTIST shall become and remain a member in good standing of any labor unions with which the COMPANY may at any time have agreements lawfully requiring such union membership, including, but not limited to, the American Federation of Musicians and the American Federation of Television and Radio Artists. All masters subject hereto shall be produced in accordance with the rules and

regulations of all unions ... ving jurisdiction.

20. blank

21. (a) In additional ARTIST's recording commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings. ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner. ARTIST acknowledges that the production of Pictures, involved matters of judgement with the respect to art and taste, which judgement shall be exercised by COMPANY and COMPANY's decisions with respect thereto shall be final after first attempting to consult with ARTIST. COMPANY will endeavor to consult with ARTIST as to the Production of pictures. COMPANY shall release 3 singles with promotional videos for each LP released hereunder.

(b) (i) Each Picture produced during the Term of this Agreement shall be owned by COMPANY (including the worldwide copyrights therein and thereto and all extensions and renewals thereof) to the same extent as COMPANY's rights in master recordings made under this Agreement.

(ii) COMPANY will have the unlimited right to manufacture Videoshows of the Picture to rent, sell, distribute, transfer, sublicense or otherwise deal in such Videoshows under any trademarks, trade names and labels; to exploit the Picture by any means now or hereafter known or developed; or refrain from any such exploitation, throughout the world.

(c) (i) - COMPANY agrees to advance all costs actually incurred in the production of Pictures and videos made by COMPANY. COMPANY shall submit to ARTIST for ARTIST's reasonable approval in writing, the following information: the musical compositions and other material to be embodied thereon; (ii) the general concept therefor and (iii) the producer, director, and any other key personnel therefor. Following COMPANY's receipt of ARTIST's approval of said information, COMPANY shall commence production of the Picture. (iv) Fifty Percent of all sums paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(ii) Fifty percent of each of the following sums, if any, paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all audio royalties becoming payable to ARTIST pursuant to this agreement.

(A) All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Picture;

15

(B) part of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

(C) If in connection therewith COMPANY furnishes any of its own facilities, materials, services for equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is not standard rate, the market value for the services or thing furnished.

(iii) All sums that COMPANY in its sole discretion deems reasonably necessary or reasonably advisable to pay (unless due to the sole fault of COMPANY in which case COMPANY shall pay) in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractual payments that are due or may become due on the part of COMPANY, to each particular ARTIST, or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto. No payment pursuant to this subparagraph 2l(c)(iii) shall constitute a waiver of any of the ARTIST's express or implied warranties and representations.

(d) (i) Conditioned upon ARTIST full and faithful performance of all of the terms and conditions of this Agreement, COMPANY shall pay ARTIST royalties equal to fifty (50%) percent of COMPANY's Video Net Receipts with respect to COMPANY's exploitation of Pictures subject to this Agreement. Monies earned and received by COMPANY or credited to COMPANY from any licensee (rather than monies earned and received by the licensee) in respect of exploitation of Pictures shall be included in the computation of Video Net Receipts.

(ii) video royalties provided in subparagraph 21(d)(i) include any royalty obligations COMPANY may have to any other person, firm or corporation who supplied sservicesor rights used in connection with Pictures, including, without limitation, producers, directors, extras, and music publishers, and any such royalties shall be deducted from the royalties ootherwisepayable to ARTIST.

(iii) With respect to audiovisual material embodying Pictures made hereunder together with other audiovisual material, royalties payable to ARTIST shall be computed by multiplying the royalties ootherwiseapplicable by a fraction, the numerator of which is the amount of playing ttimein such audiovisual material of Pictures made hereunder and the denominator of which is the total number of artists whose performances are embodies

16

on such Pictures.

(e) COMPANY shall have the right to use and allow others to use each Picture for advertising and promotional purposes with no payment to ARTIST. As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY received no monetary consideration from licensees in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reimbursement for transaction costs incurred by COMPANY in connection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f) In all other respects (e.g., the times for accountings to be rendered, and warranties and representations made by ARTIST) Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

22. Intentionally deleted.

23. COMPANY shall prepare the artwork for the album covers used in connection with the releases hereunder in the United States, during the Term of this Agreement, of each newly-recorded LP required to be recorded and delivered hereunder (hereinafter, the "Artwork"), upon all of the following conditions:

Before preparation and the incurring of any expenses in connection with the album Artwork, ARTIST may discuss completely with a representative of COMPANY's art department, the proposed artwork to be produced by COMPANY, all of which shall be subject to the decision of COMPANY's art department. COMPANY will use best efforts to consult with ARTIST as to the album Artwork.

(b) (i) COMPANY will deliver all such Artwork prepared by COMPANY to ARTIST for ARTIST's reasonable approval, prior to the printing of said album cover.

24 One half of all sums paid by COMPANY in connection with independent promotion, shall be an advance against and recoupable to COMPANY out of all record royalties becoming payable to ARTIST pursuant to this agreement between the parties.

25. For the purposes of this Agreement, the following definitions shall apply:

(a) "Master" - The equivalent of a seven (7") inch 45 rpm single-sided recording of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b) "LP" - A twelve (12") inch 33-13 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one (1) LP intended to be released, packaged and sold together for a single overall price, shall be deemed

17

to be the equivalent of on 1) LP for the purposes of this Agree  nt, but shall not be recorded or delivered hereunder without COMPANY's prior written consent, Company shall have the right to call for 1 overcall album during the initial period and each option period on the same terms and conditions provided herein during the initial and each option period. Best of and greatest hits LP's shall not be considered LP's which meet the delivery requirements or trigger advances as herein provided.

(c) "Records", "phonograph records", "recordings" and "sound recordings" All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become know, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(d) "Delivery", "deliver" or "delivered"- The actual receipt by COMPANY of completed, fully mixed, leadered ;  and edited masters comprising each LP, commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

"Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(f) "mid-priced LP" - an LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67%) percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY's licensees as applicable, then-current newly-released LPs.

(g) "budget LP" - all LP which bears a suggested retail list price in the applicable country of the Territory or less than sixty-seven (67%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's retail list price of the majority of COMPANY's or COMPANY's licensee's as applicable, then-current newly released LPs.

(h) "Pictures" - motion pictures or other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

18

Video, Videocassette, Videodisc, any other devices, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(j)  "Videodisc" - A disc-type Videoshow that enables the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(k)  "Videocassette" - a Videoshow other than Videodisc Videoshow in the form of Pre-recorded tape).

(l)  "Video Masters" - master Videoshows.

(m)  "Video Net Receipts" - monies earned and received by COMPANY from exploitation of Pictures and less any out-of-pocket expenses, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

26.  COMPANY may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of COMPANY, or to any partnership or other venture in which COMPANY may participate provided COMPANY remains secondarily liable. COMPANY may also assign its rights to any of its licensees if advisable in COMPANY's sole discretion to implement the license granted. No such assignment shall affect Company's rights hereunder nor relieve ARTIST of any obligations under this agreement.

27  This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY. A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All of COMPANY's rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any remedy, option or right available to COMPANY. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after ARTIST learns of such breach, ARTIST service written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days (except thirty (30) days if such alleged breach is the payment of monies hereunder) after receipt of such notice.

19

28. This Agreement shall be deemed to have been made in the State of Florida and its validity, construction, performance and breach shall be governed by the laws of the State of Florida applicable to agreements made and to be wholly performed therein. ARTIST agrees to submit itself to the jurisdiction of the Federal or State courts located in Miami in any action which may rise out of this agreement and said courts shall have exclusive jurisdiction over all disputes between COMPANY and ARTIST pertaining to this Agreement and all matters related thereto. In this regard, any process in any action or proceeding commenced in the courts of the State of Florida arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon ARTIST by delivering or mailing the same, via registered or certified mail, addressed to ARTIST at the address provided herein for notices to ARTIST; any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida. Nothing contained herein shall constitute a waiver of any other remedies available to COMPANY. Nothing contained in this Paragraph 28 shall preclude COMPANY from joining ARTIST in an action brought by a third party against COMPANY in any jurisdiction, although COMPANY's failure to join ARTIST in any such action in one instance shall not constitute a waiver of any COMPANY's rights with respect thereto, or with respect to any subsequent action brought by a third party against COMPANY. There shall be no recoupment of past deficit balances, if any, from any amounts due hereunder.

29. ARTIST and each individual member of ARTIST hereby grants to COMPANY and its licenses the exclusive right, throughout the world, to use and authorize the use of ARTIST's approved name, portraits, pictures, approved likeness, and biographical material, either alone or in conjunction with other elements, in connection with the sale, lease, licensing or other disposition of merchandising rights. For the rights granted by ARTIST to COMPANY in this paragraph, COMPANY shall pay ARTIST royalty of fifty (50%) percent of COMPANY's net receipts derived from the exploitation of such rights, aft\er deducting all costs and third party payments relating thereto; and such payment shall be accounted to ARTIST in the manner otherwise provided herein. Relative to any and all activities conducted and all activities conducted and contemplated by this paragraph, COMPANY agrees to regularly and reasonably inform ARTIST, in writing, of progress to submit to ARTIST, within thirty (30) days of execution, copies of all contracts entered into by COMPANY relative to those activities provided for in this paragraph. Company shall own all rights to Artist's current or other tradename which will be used by Artist during the term of this Agreement. Solo merchandising rights are not covered by this agreement unless the solo project is released hereunder and the merchandising right for such solo project would then be included.

30. This Agreement shall not become effective until executed by all parties.

31. Grant of Rights

Assignment of Copyrights. ARTIST (for materials written and or recorded hereunder only) hereby sells, transfers, and assigns to COMPANY its successors and assigns, an undivided fifty (50%) percent of the publishing interest in the Compositions,

including without limita⌐ ⌐, the copyrights therein and any and   modifications, substitutions and renewals and/or extensions thereof throughout the world (the "Territory"), and all claims and causes of actions related to the Compositions accruing at any time and all other rights of whatsoever nature in the Composition, including without limitation, the titles, words and music of the Compositions and every arrangements, adaptation and version thereof. ARTIST will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Compositions subject to this agreement as COMPANY may reasonably request to carry out the purposes of this agreement, (including, without limitation, the Exhibits annexed hereto), and COMPANY may sign such documents in your name or the name of any Controlled Songwriter (song which is written, owned or controlled in whole or in part by ARTIST) and make appropriate disposition of them. It is the intention of the members that the remaining 50% be split equally and that the writer's portion of each song be split equally among all members of ARTIST.

31.2     Administration COMPANY and its Licensees will have the sole, exclusive and perpetual right, throughout the Territory to:

(a)   License and cause others to license the exploitation of the Compositions, including, without limitation, the right to license broadcast and other public performances and the right to license the manufacture distribution and sale of Phonograph Records embodying any one or more Compositions.

(b)   Administer and grant rights in the Compositions and the copyrights therein.

(c)   Print, publish and sell printed editions of the Compositions.

(d)   Collect all monies payable during the term and Retention Period, with respect to the Compositions, in addition to all monies due prior to the date hereof, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ACSAP), Broadcast Music, Inc. (BMI), or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding any songwriter share of public performance income. If a Society in any territory does not license any particular public performance of a Composition, it is understood COMPANY may license that use directly and all income received by COMPANY in connection with such licenses shall be deemed Gross Income and subject to accounting hereunder.

(e)   Make arrangements, or otherwise adapt or change any one or more Compositions in any manner.

(f) Otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof and exercise all of such rights as fully as if the copyrights were registered in COMPANY's name alone and COMPANY alone were the sole and exclusive owner thereof and of the Compositions.

21

31.3  Power of [ ]rney. ARTIST hereby irrevocably [ ]norize, empower and appoints COMPANY, ARTISTS true and lawful attorney, for the term of the copyrights (including songwriter copyrights) in the respective Compositions and any renewals or extensions thereof, to secure any renewal periods for COMPANY's benefit, to initiate and compromise any claim or action with respect to the Compositions including any claim or action against infringers of COMPANY or ARTISTS rights in the Compositions, and to execute in ARTISTS name, and the name of any Controlled Songwriter, any and all documents and/or instruments necessary or desirable to accomplish the foregoing and/or to evidence COMPANY's ownership of the copyrights during such periods and/or to effectuate COMPANY's rights hereunder. The power granted herein is coupled with an interest and irrevocable. COMPANY will cause the copyrights in the Compositions to be registered or re-registered jointly in the name of COMPANY and ARTIST and such additional parties as appropriate.

31.4 Name and Likeness COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate any likenesses in the exploitation of musical compositions and the marketing of other merchandise of any kind. During the term of this agreement neither you nor any Controlled Songwriter shall authorize any Party other than COMPANY to use the name or likeness of Controlled Songwriter (or any professional, group, or other assumed or fictitious name used by Controlled Songwriters) in connection with the exploitation of musical compositions. Company shall own all rights to ARTIST's current or other tradename which will be used by ARTIST during the term of this Agreement. Company shall not own each individual's tradename. The rights for the solo projects written and recorded hereunder shall however, be covered hereunder.

32.  Group Provisions

(a)  Your obligations under this Agreement are joint and several. However, each of you shall have the right to write and or record solo projects elsewhere provided you first give COMPANY its matching right as provided for herein. All references to the ARTIST include all members of the group inclusively and each member individually, unless otherwise specified. A breach of any term or provisions or a disaffirmance or attempted disaffirmance of this Agreement for a reason by and one of the individuals comprising your members shall, at COMPANY's election, be deemed a breach by all members comprising the group.

(b)  Additional individuals may become members of your group only with COMPANY's prior written consent. COMPANY shall have the sole right to designate new members of your group at any time. You shall cause any individual so approved by COMPANY to be bound by all terms and provisions of this Agreement, and you shall, upon our request, cause such individual to execute and deliver such documents as COMPANY may deem necessary or expedient to evidence such individual's Agreement to be bound.

(c)  (i)  If any of your members ("leaving member") ceases, refuses, neglects, ceases or fails to perform as a member of the group for any reason whatsoever, you will notify COMPANY thereof promptly. The leaving member will be replaced by a new

22

member, if COMPANY   agrees in writing. The new member   ill be deemed substituted as party to this Agreement in the place of the leaving member and you will cause the new member to execute and deliver to COMPANY such instruments as COMPANY, in it's judgement, may require to accomplish that substitution. Thereafter, you will have to further obligation to furnish the services of the leaving member for performances under this Agreement, including, without limitation, subparagraphs (b), (c) and (d) of this paragraph. You will not permit any musician to perform in place of the leaving member in making Master Recordings under this Agreement unless that musician has executed and delivered to COMPANY the substitution instruments referred to above.

(ii)   COMPANY will have the right to terminate the Term of this Agreement with respect to the remaining members of the Artist by notice given to you at any time before the expiration of ninety (90) days after COMPANY's receipt of your notice provided in (a) above, In the event of such termination, all of the members of the Artist will be deemed leaving members as of the date of such termination notice, and paragraph will apply to all of them, collectively or individually as COMPANY elects.

(iii) Company shall have the option to engage the exclusive services of each leaving member as a recording artist ("Leaving Member Option"). The Leaving Member Option may be exercised by COMPANY by notice to the leaving member at any time before the receipt of your notice under section (a) above, as the case may be. If concerned will be deemed to have COMPANY exercises that Option, the leaving member(s) or Agreement for the services of an executed COMPANY's standard form of term recording individual recording artist on an approved budget basis without recording fund provisions and containing the following provisions:

(1)  the term will commence on the date of COMPANY's exercise of such Leaving Member Option and may be extended by Paragraph 1 of this Agreement, for the same number of additional Contract Periods as the number of option Contract Periods, if any, remaining pursuant to Paragraph 1 at the time of Company's exercise of the Leaving Member Option (but at least two (2) such additional periods in any event);

(2) the Minimum Recording Commitment for each Contract Period of such Term will be Master Recording sufficient to comprise two (2) 12" singles or its equivalent, with an overcall option equivalent to that granted to Company in Paragraph 3 of this Agreement;

(3)  the royalty percentage rates in respect of records and video-records embodying performances recorded during that term will be the same provided herein; and,

(4)  if your royalty account under this Agreement is in an unrecouped position at the date of COMPANY's exercise of the Leaving Member Option, a pro-rata part of the amount of that unrecouped balance, determined by computing the percentage of the

original group being retained by COMPANY will constitute an Advance recoupable from those royalties.

(d) No leaving member shall have the right thereafter to use any professional name or servicemark utilized by other of your members at any time during the Tenn of this Agreement, or any servicemark similar thereto. Furthermore such leaving member shall not have the right to promote or allow himself to be promoted as, "formerly of (the Mark)" or by any similar label.

33. There shall be no crosscollateralization between record royalties, publishing income and merchandising income.

YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR ALL OF THE WORLD FOR A PERIOD IN EXCESS OF FIVE (5) YEARS. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL

OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

LIL' JOE RECORDS, INC.

BY: _____
Joseph Weinberger, President

_____
David P. Hobbs

Witness to all signatures:

Robert C. MacDonald

_____
Mark Ross

_____

_____
Christopher Wong Won

_____

24

# EXHIBIT C

Case No.: 98-802 CIV MIDDLEBROOKS

the bankruptcy estate of Luke Records, Inc. all right, title, and interest in, *inter alia,* the "2 Live Crew" Marks. Consequently, Lil' Joe Records, Inc. is the owner of the "2 Live Crew" Marks.

4.      Further, in or about March 1995, Hobbs, along with the other members of the performing group 2 Live Crew entered into a Exclusive Recording Agreement (the "March 1995 Exclusive Recording Agreement") with Lil' Joe Records, Inc.   Pursuant to the March 1995 Exclusive Recording Agreement, Hobbs specifically agreed that in the event he became disassociated with the performing group 2 Live Crew, he would cease all use of the "2 Live Crew" Marks, and that he would not promote himself as a former member of 2 Live Crew.

5.      That on or about September 19, 1997, Hobbs did in fact leave the performing group 2 Live Crew.   The remaining members of the performing group, pursuant to the March 1995 Exclusive Recording Agreement with Lil' Joe Records, Inc., continued to record and perform as 2 Live Crew.

6.      Since departing from the performing group, Hobbs, without permission and/or authorization, has used, and continues to use, the "2 Live Crew" Marks in violation of the March 1995 Exclusive Recording Agreement.   The Court finds that Hobbs has publically promoted himself as a member of 2 Live Crew, performed as 2 Live Crew, promoted and marketed his performing act as 2 Live Crew, and used the "2 Live Crew" Marks in connection with promoting and/or marketing his performing act.   Further the Court finds that Hobbs' actions demonstrate an intention to continue performing as 2 Live Crew.

SAL\3935.0006\110538-42098

2

Case No.: 98-802 CIV MIDDLEBROOKS

7.    The unauthorized actions taken by Hobbs coincide with 2 Live Crew's release of its new master album "The Real One" which  Lil' Joe Records, Inc. has expended over $100,000.00 in recording, mastering, and distributing.

### Conclusions of Law

1.    Hobbs' unauthorized use of the "2 Live Crew" Marks creates a substantial likelihood of confusion among the consuming public. Thus, the Court concludes that Hobbs' actions, in violation of the March 1995 Exclusive Recording Agreement, if continued will cause immediate irreparable harm to Plaintiffs.

2.    Given that Plaintiffs are currently in the process of promoting and distributing 2 Live Crew's recent full length release "The Real One," the Plaintiffs, if preliminary injunctive relief is not granted, will further suffer immediate irreparable harm for which there is no adequate remedy at law.

3.    Given Hobbs unauthorized use of the "2 Live Crew" Marks, or other confusingly similar marks, there exists a strong likelihood of consumer confusion.  Therefore, this Court deems that the public interest will be protected rather than harmed by the entry of a preliminary injunction.

4.    Plaintiffs have demonstrated a substantial likelihood of success on the merits.

5.    The consequent injury that would result to Plaintiffs if injunctive relief is denied outweighs the damage that could result to Hobbs if such relief is granted.

It is therefore ORDERED and ADJUDGED that:

SAL\3935.0006\110538-42098

3

Case No.: 98-802 CIV MIDDLEBROOKS

Plaintiffs' Verified Emergency Motion for Preliminary Injunction pursuant to Rule 65, Federal Rules of Civil of Procedure, is hereby GRANTED.

Accordingly, Hobbs, his agents, employees, representatives, and/or anyone acting on his behalf must immediately cease any and all use of the "2 Live Crew" trademarks, service marks, logos, and/or artwork associated with the musical performing group 2 Live Crew.   Hobbs, his agents, employees, representatives, and/or anyone acting on his behalf is further prohibited from promoting, marketing, and/or representing Hobbs as a member of 2 Live Crew, performing as 2 Live Crew, or promoting Hobbs as a former member of 2 Live Crew. This preliminary injunction shall become effective as of the date of this Order, and upon the Plaintiffs posting of an bond in the amount of *25,000* and shall continue until further order of this Court.

DONE AND ORDERED, at Miami, Florida this *22* day of April, 1998.  *5:45 p.m.*

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies furnished:

Richard C. Wolfe, Esq.
Counsel for Plaintiffs

David Hobbs

SAL\3935.0006\110538-42098

4

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO:  06-21958 CIV-HOEVELER

LIL' JOE WEIN MUSIC, INC ., a Florida
Corporation and LIL' JOE RECORDS, INC.
a Florida Corporation.

      Plaintiff,

v.

CHRIS WONGWON individually,
EDDIE YOUNGBLOOD individually,
DWAYNE KEMP individually,
DETRON BENDROSS individually
JOHN DOE, an unknown individual.

      Defendants.

_____/

## AGREED ORDER GRANTING PLAINTIFFS'
## MOTION FOR PERMANENT INJUNCTION

**THIS MATTER** came before the Court on Plaintiff's Motion for Permanent Injunction

and Motion to Hold Defendant, Christopher Wongwon, in contempt for violation of prior Orders

of this Court.  Upon a review of the verified pleadings and the evidence presented at the hearing

on October 6, 2006, and the Affidavit of Andrew Longerman, the Court makes the following

findings of fact and conclusions of law:

      1.     Plaintiff, Lil Joe Wein Music, Inc., is in the music publishing business and is the

owner of the composition copyrights to the songs recorded by the group known as 2 Live Crew.

      2.     Plaintiff, Lil Joe Records, Inc., is in the recording business and is the owner of the

sound recording copyrights to the recordings made by the group known as 2 Live Crew.

3.      Plaintiff, Lil Joe Records, Inc., is the owner of the trademark "2 Live Crew" having duly registered same, and it is the owner of all rights associated therewith (the "Mark").

4.      Pursuant to an Order dated October 22, 2002 by United States District Judge James Lawrence King in Case No. 02-22629, Defendant, Christopher Wongwon made a false and fraudulent attempt to register a claim to the Mark owned by Plaintiff, Lil Joe Records, Inc., and Christopher Wongwon fraudulently attempted to assign same to his brother, Lawrence Wongwon.

5.      On August 4, 2006, this Court did enter a Temporary Restraining Order prohibiting the Defendants from infringing upon the Mark owned by Lil Joe Records, Inc. and/or from performing, advertising or using the name "2 Live Crew" or any close facsimile of same. Defendants intentionally violated the Temporary Restraining Order by performing as "2 Live Crew" in Maplewood, Minnesota.

6.      On August 15, 2006, this Court did enter a Temporary Injunction, again prohibiting the Defendants from infringing upon the Mark owned by Lil Joe Records, Inc, or performing as, or advertising the name "2 Live Crew". On August 20, 2006, Defendants were served by the U.S. Marshalls with a copy of the Temporary Injunction.

7.      The Defendants, primarily Christopher Wongwon, intentionally violated the clear and express provisions of the Temporary Injunction and Temporary Restraining Order by:

(a)      Performing as 2 Live Crew at Club Revolution on August 20, 2006, in Ft. Lauderdale, Florida.

(b)      By performing as 2 Live Crew at Mirrors Club in St. Joseph, Missouri, on September 8, 2006.

2

(c)   By failing to provide the accounting as required by Paragraph 4 of the Temporary Injunction.

(d)   By continuing to utilize the name "2 Live Crew" and/or "Mr. 2 Live" on various websites including:

ChinamanRecords.Com

My Space.Com/FreshKid Inc.

My Space.Com/the2LiveCrew

My Space.Com/XRatedRydas

8.      Defendants have acknowledged receipt of and service of the Complaint, the Temporary Restraining Order and the Temporary Injunction, and Defendants have not presented a valid reason for their failure to comply with the prior Orders of this Court.

IT IS ORDERED AND ADJUDGED:

1.      Plaintiff's request for a Permanent Injunction is **GRANTED.**

2.      Defendants, Christopher Wongwon, Eddie Youngblood, Dwayne Kemp and Detron Bendross, together with their employees, agents, attorneys and persons acting in concert with them are hereby permanently enjoined and restrained from:

(a)   Performing or offering to give any live concert performances using the name "2 Live Crew" or "Mr. 2 Live" or any reasonable facsimile thereof.

(b)   Selling or giving away ring tones, digital downloads, or any recorded music using Plaintiff's Mark or copyrights.

(c)   Advertising, performing, promoting, offering to sell, distributing or transferring any items of recorded music or artwork bearing the name,

3

image, likeness of Plaintiff's copyrights or trademark on the internet or elsewhere in commerce.

(d)    Selling, transferring, distributing, licensing or otherwise disposing of any recorded music bearing the name, image, likeness or copyrights or trademark owned by Plaintiffs.

3.    Defendants shall immediately remove all and are hereinafter permanently prohibited from making any reference to the name "2 Live Crew" and/or "Mr. 2 Live" or any facsimile thereof in any website, web address, e-mail, or advertising, including but not limited to the websites listed above. Defendants shall, within five (5) days, provide proof to Plaintiffs that they have removed all references to same in the web addresses listed above and provide the identity of any person/corporation using the "2 Live Crew" Mark.

4.    All Defendants shall, within 5 days, provide a full and complete accounting to Plaintiffs of all prior uses of their use of the name "2 Live Crew," and all monies earned therefrom since July 2003 and any resulting royalties due to Plaintiffs under the terms of the prior License Agreement (which is now terminated). Defendant, Wongwon, shall pay same to Plaintiffs said amounts, within six (6) months from October 6, 2006. If Defendant, Wongwon, fails to pay same to Plaintiffs, he shall fully account to Plaintiffs for all monies earned in the six (6) months following this Order.

5.    Defendants shall, within five (5) days, publish an apology suitable to Plaintiffs on each of the websites listed above, with respect to anti-Semitic statements made by Defendants about the Plaintiffs, and with respect to the so-called consumer protest of Plaintiffs' products. Said apology shall acknowledge that Plaintiffs are the only parties authorized to sell authentic merchandise and music by the "2 Live Crew" and use the Mark.

4

6.     The $2,000.00 bond deposited by Plaintiffs with the Court shall be returned to the

Plaintiffs.

7.     This Court reserves ruling on Plaintiffs' request for an Order of Contempt and a

request for the taxation of attorneys' fees pursuant to 15 U.S.C §1117, 17 U.S.C §505 and

§817.41, Fla Stat., pending Defendants' compliance with the terms of this Agreed Order.

   **DONE AND ORDERED** in Chambers at Miami, Florida, this __20th__ day of October,

2006.

                                    _William M. Hoeveler_____

                                    **William M. Hoeveler**
                                    **United States District Judge**


_Copies Furnished To_:

All Defendants of Record


H:\Lil' Joe Records\v. Wong Won\Pldgs\Order granting permanent injunction.doc

# EXHIBIT E

















**DJ MR MIXX "Tha 808 King" is
the FOUNDER, CREATOR,
PRODUCER, AND DJ of the
original 2 LIVE CREW
Producing such hits as:
"Hoochie Mama"**

**"Me So Horny"**

**"We Want Some Pussy"**

WE CHANGED THE RAP GAME! PERIOD



FIRST GOLD & PLATINUM ALBUMS FROM THE SOUTH

# 1987 - 1992

HALL OF FAME CONTENDERS 2010 <..>

DJ Mr. Mixx was the first scratch DJ, along with creating the "Miami Bass Krunk Sound", to be recognized from the south. He was the first DJ, in 1985, to have a megamix recording, which is scratching different record phrases on time to the beat of the music to create a song in itself. The s... was called "What I Like", from Fresh Beat Record

# Check out all my "BIG BOOTY HOES" at Bootyliciousmag.com,alo g with my videos on youtube.com.....search username "dhobbs2live"

David Hobbs Mr. Mixx Recordings MCAA Records 305 926 7194 any quest leave message on myspace or email dhobbs2live@yahoo.com

DJ Mr. Mixx is on tour as a celebrity DJ, affiliate of Bootylicious Magazine, of collegepeepshowtv.com, and producing music tracks for top rappers, si and up and coming independent record companies.

AN UNDENIABLE LEGEND OF THE RAP GAME!!



**THE 2 LIVE CREW DJ MR.MIXX THA 808 KING's Friend Spa (Top 27)**

THE 2 LIVE CREW DJ MR.MIXX THA 808 KING has 4984 friends.

| DJ MR MIXX / MCAA RECORDS | JT MONEY | Ice Cube | Dirty Sanchez |
|---|---|---|---|
|  |  |  |  |

| DJ CRUMBZ | Michelmann vom PARTY BASS MOB | FRAUENARZT / AZN MSK Vol.2 NUR 10,97€ @ AMAZON | TOP B |
|---|---|---|---|
|  |  | |  |

| BOOTY DATABASE | DJ Qbert | GO TO myspace.com/dj mrmixx for official page | IceColdChar ne.com |
|---|---|---|---|
|  |  | |  |

| ♥ MisS IndependenT ♥ | Follow me twitter.com/Es ther_Baxter | Dennis Hof | Sexy Red o N'Dependen Ryderz S/C |
|---|---|---|---|





| Record Label | MCAA RECORDS , Mr. Mixx Recordings |
| Type of Label | Indie |

THE 2 LIVE CREW DJ MR.MIXX THA 808 KING's Friends
Comments

# EXHIBIT F



# EXHIBIT G



# DJ MR MIXX BOOKING VIDEO

dj mr mixx    Search

Home   Videos   Channels   Shows

Create Account   or   Sign In

Subscriptions   History   Upload

**dhobbs2live**
July 09, 2009
(more info)

Subscribe

BOOK DJ MR MIXX NOW..... email:
mixx808king@yahoo.com or call 305 926 7194

URL  http://www.youtube.com/watch?v=rDfHSowG

Embed  <object width="425" height="344"><param na

## More From: dhobbs2live

### Related Videos

**DJ MR MIXX SCRATCH ARCHIVE DOUBLE DUTCH** 3:59
7,430 views
dhobbs2live

**Eko Fresh & DJ Mr. Mixx - Booty** 3:49
350 views
alexanderhlebino

**DJ MR MIXX SCRATCH ARCHIVES 1 PRACTICE SESSION** 2:40
1,705 views
dhobbs2live

**ATZEN MUSIK ab JULI 09 im RIU PALACE Mallorca L...** 2:01
61,795 views
atzenmusiktv

**YOUNG JEEZY GANGSTA SCRATCH REMIX** 4:57
3,315 views
dhobbs2live

**DJ OBAMA DROP** 0:48
891 views
dhobbs2live

**N.W.A. Drink it up**
20,281 views
MRJARDIM

6 ratings

422 views

Favorite   Share   Playlists   Flag

Facebook   Twitter   MySpace   (more share options)

### Featured Videos

Report: Baby Skull Jewelry 2:42
...
651,859 views
TheOnion

J-Wowws Boobs are as 4:56
...
1,779,650 views
sxephil

BEST BIG BROTHER... 8:45
237,825 views
SHAYTARDS

## Statistics & Data

**Video Responses (0)**    Sign in to post a Video Response

**Text Comments (5)  Options**    Sign in to post a Comment

**techknign** (2 months ago)    Reply    0
Mr. Mixx whats good i'm glad to see you still doin your thang ! Question are you still producing get back to me

**BOBBYBLENDZ** (6 months ago)    Reply    +1
man, u did this set at the new music seminar too, right?

**BOBBYBLENDZ** (6 months ago)
*Comment removed by author*

**dell1972** (7 months ago)    Reply    0
THE BEST THAT EVER DID IT!

**djneedlz** (7 months ago)    Reply    0
mr. mixx on the mix,,,

Showing 5 of 5 comments    Show More Comments    View All 5 comments

## Would you like to comment?

Join YouTube for a free account, or sign in if you are already a member.

Try YouTube in a fast, new web browser! **Download Google Chrome for PC**

Help   About   Safety   Privacy   Terms   Copyright   Partners   Developers   Advertising

Language: English    Location: Worldwide    Safety mode: Off

# EXHIBIT H

YouTube - DJ MR MIXX BOOKING VIDEO



# EXHIBIT I

# CERTIFICATE OF REGISTRATION

For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE



**VA 1 – 129 – 779**

VAU0001129779

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS

United States of America

**EFFECTIVE DATE OF REGISTRATION**

MAY 15 2001
Month    Day    Year

OFFICIAL SEAL

EPARATE CONTINUATION SHEET.

---

**TITLE OF THIS WORK ▼**

AS NASTY AS THEY WANNA BE (XR-107)

**NATURE OF THIS WORK ▼** See Instructions

ALBUM COVERS, PHOTOS, GRAPHIC DESIGN *Record Jacket artwork*

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

---

**2**

**a** **NAME OF AUTHOR ▼**

LIL' JOE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Map
☒ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture
☐ 2-Dimensional artwork
☐ Reproduction of work of art
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

---

**3**

**a** **Year in Which Creation of This Work Was Completed**
1989
◀ Year in all cases.
This information must be given

**b** **Date and Nation of First Publication of This Particular Work**
Complete this information ONLY if this work has been published.
Month ▶ 5    Day ▶ 1    Year ▶ 1989
USA
◀ Nation

---

**4**

See instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 NW 167th STREET, F-17
MIAMI, FLORIDA 33015

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED NO. 26.2001
MAY 15 2001
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
MAY 15 2001
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

---

**MORE ON BACK ▶**
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions
• Sign the form at line 8

DO NOT WRITE HER

Page 1 of 2 pages

# EXHIBIT J

**CERTIFICATE OF REGISTRATION**



OFFICIAL SEAL

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE
RE

**VA 1-141-129**

EFFECTIVE DATE OF REGISTRATION

MAY 15 2001
Month      Day      Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**

TITLE OF THIS WORK ▼

BANNED IN THE U.S.A.   (XR-114)   NASTY VERSION

NATURE OF THIS WORK ▼ See Instructions
ALBUM COVERS, PHOTOS, GRAPHIC DESIGN, *Record jacket Art*

PREVIOUS OR ALTERNATIVE TITLES ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼      Number ▼      Issue Date ▼      On Pages ▼

**2**

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** NAME OF AUTHOR ▼

LIL' JOE RECORDS, INC.

DATES OF BIRTH AND DEATH
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☒ No
Pseudonymous?   ☐ Yes   ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2-Dimensional artwork      ☒ Photograph       ☒ Text
☐ Reproduction of work of art ☐ Jewelry design  ☐ Architectural work

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ▶
Domiciled in ▶

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Check appropriate box(es). See Instructions
☐ 3-Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2-Dimensional artwork      ☐ Photograph       ☐ Text
☐ Reproduction of work of art ☐ Jewelry design  ☐ Architectural work

**3**

**a** Year in Which Creation of This Work Was Completed
1990
◀ Year   This information must be given in all cases.

**b** Date and Nation of First Publication of This Particular Work Complete this information ONLY if this work has been published.
Month ▶ 7   Day ▶ 24   Year ▶ 1990
USA ◀

**4**

See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 NW 167th STREET, F-17
MIAMI, FLORIDA 33015

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED
MAY 15 2001
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
MAY 15 2001
FUNDS RECEIVED

DO NOT WRITE HERE
FOR COPYRIGHT OFFICE USE ONLY

MORE ON BACK ▶   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.      DO NOT WRITE I

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
   Yes

FORM

FO
COPYF
OFFI
US
ONI

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☒ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.      ONLY PA'S & SR'S FILED

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼ _____ Year of Registration ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

b. Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                              Account Number ▼

LIL' JOE WEIN MUSIC, INC.                          # DA081523

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

.JOSEPH WEINBERGER / ROBERT MACDONALD
 6157 NW 167th STREET, F-17
 MIAMI, FLORIDA 33015

**b**

Area code and daytime telephone number ▶ ( 305) 362-8900          Fax number ▶ (305) 822-1122

Email ▶  LJRWRED@AOL.COM

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶  {
☐ author
☐ other copyright claimant
☒ owner of exclusive right(s)
☒ authorized agent of  LIL' JOE WEIN MUSIC, INC.
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

 JOSEPH WEINBERGER                                          Date ▶ 5:/07/01

     Handwritten signature (X) ▼

   ☒ x _____

**3**

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼  JOSEPH WEINBERGER / ROBERT MACDONALD
         c/o LIL' JOE RECORDS, INC.

Number/Street/Apt ▼
         6157 NW 167th STREET, F-17

City/State/ZIP ▼
         MIAMI, FLORIDA 33015

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable filing fee in check or money  As of July 1, 1
   order payable to Register of Copyrights         the filing fee
3. Deposit material                                 Form VA is $3

Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connecti

# EXHIBIT K

# CERTIFICATE OF REGISTRATION



UNITED STATES COPYRIGHT OFFICE

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*

OFFICIAL SEAL



VA 1-144-202

VAU001144202 ✶

EFFECTIVE DATE OF REGISTRATION

MAY 14 2001

Month    Day    Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**TITLE OF THIS WORK ▼**
THE 2 LIVE CREW   E-3003   (Explicit Version)
LIVE IN CONCERT

**NATURE OF THIS WORK ▼** See instructions
ALBUM COVERS,   PHOTOS,
GRAPHIC DESIGN *record jacket*

**PREVIOUS OR ALTERNATIVE TITLES ▼**   *Artwork*

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared   Title of Collective Work ▼

If published in a periodical or serial give.  Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

---

## 2

### a

**NAME OF AUTHOR ▼**
LIL' JOE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA }

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See instructions**
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☒ Photograph   Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

### b

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶
Domiciled in ▶ }

**Was This Author's Contribution to the Work**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See instructions**
☐ 3-Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2-Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

---

## 3

**Year in Which Creation of This Work Was Completed**
1990
◀Year in all cases.
This information must be given

**Date and Nation of First Publication of This Particular Work**
Complete this information Month ▶ 11 Day ▶ 14 Year ▶ 1990
ONLY if this work has been published. USA ◀ Nat

---

## 4

See instructions before completing this space

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 NW 167th STREET, F-17
MIAMI, FLORIDA 33015

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED
MAY 14, 2001
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
MAY 14, 2001
FUNDS RECEIVED

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions. • Sign the form at line 8.

DO NOT WRITE HERE

# EXHIBIT L



FORM VA
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

**VA 1-129-759**

**EFFECTIVE DATE OF REGISTRATION**

MAY 15 2001
Month    Day    Year

# CERTIFICATE OF REGISTRATION



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

---

**TITLE OF THIS WORK ▼**

2 LIVE IS WHAT WE ARE  (XR-100) NASTY VERSION

**NATURE OF THIS WORK ▼** See instructions

ALBUM COVERS, PHOTOS, GRAPHIC DESIGN *Record Jacket*

**PREVIOUS OR ALTERNATIVE TITLES ▼**

*Artwork*

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared     Title of Collective Work ▼

If published in a periodical or serial give:   Volume ▼         Number ▼          Issue Date ▼          On Pages ▼

---

## 2

**NAME OF AUTHOR ▼**

a   LIL' JOE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶  USA
     Domiciled in ▶  USA

**Was This Author's Contribution to the Work**
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See instructions**
☐ 3-Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2-Dimensional artwork      ☒ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design   ☐ Architectural work

**NAME OF AUTHOR ▼**

b

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of ▶
     Domiciled in ▶

**Was This Author's Contribution to the Work**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Check appropriate box(es). **See instructions**
☐ 3-Dimensional sculpture    ☐ Map              ☐ Technical drawing
☐ 2-Dimensional artwork      ☐ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design   ☐ Architectural work

---

## 3

**Year In Which Creation of This Work Was Completed**
1987
◀ Year   This information must be given in all cases.

b **Date and Nation of First Publication of This Particular Work**
Complete this information Month ▶ 1  Day ▶ 1  Year ▶ 1987
ONLY if this work has been published.   USA   ◀ Nation

---

## 4

See instructions before completing this space

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 NW 167th STREET, F-17
MIAMI, FLORIDA 33015

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

**APPLICATION RECEIVED** NO. 26 2001
MAY 15 2001

**ONE DEPOSIT RECEIVED**

**TWO DEPOSITS RECEIVED**
MAY 15 2001

**FUNDS RECEIVED**

DO NOT WRITE HERE OFFICE USE ONLY

---

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions.   • Sign the form at line 8

DO NOT WRITE HERE

Page 2

# EXHIBIT M

Case 1:10-cv-20695-PCH Document 1 Entered on FLSD Docket 03/23/2010 Page 80 of 97

# CERTIFICATE OF REGISTRATION



**OFFICIAL SEAL**

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.



**REGISTER OF COPYRIGHTS**
*United States of America*

**FORM SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**SR 306-192**



EFFECTIVE DATE OF REGISTRATION

Month **2** Day **26** Year **01**

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

SHAKE A LIL' SOMETHIN'   (XR-215)

**PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼**

---

## 2

**a** NAME OF AUTHOR ▼

LIL' JOE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?        ☐ Yes  ☒ No
Pseudonymous?     ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
~~ALBUM OF SONGS~~ ☀ sound recording

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank

**b** NAME OF AUTHOR ▼

**DATES OF BIRTH AND DEATH**
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?        ☐ Yes  ☐ No
Pseudonymous?     ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

**DATES OF BIRTH AND DEATH**
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?        ☐ Yes  ☐ No
Pseudonymous?     ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

## 3

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
1996 ◀ Year   This information must be given in all cases.

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ 7  Day ▶ 23  Year ▶ 1996
USA                                          ◀ Nation

---

## 4

**a** COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 NW 167TH STREET, F-17
MIAMI, FLORIDA 33015

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED
FEB 26 2001
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
FEB 26 2001
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.

DO NOT WRITE HERE

# EXHIBIT N

# CERTIFICATE OF REGISTRATION



OFFICIAL SEAL

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

**FORM SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

SR 245-408



=SR0000245408=

EFFECTIVE DATE OF REGISTRATION

*Jan. 5, 1998*

Month         Day         Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

---

**1**   2 Live Crew Goes To The Movies - (explicit version)

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF MATERIAL RECORDED ▼ See instructions
- ☒ Musical
- ☐ Musical-Dramatic
- ☐ Dramatic
- ☐ Literary
- ☐ Other

---

**2  a**   NAME OF AUTHOR ▼   Lil Joe Records, Inc.

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
- ☒ Yes
- ☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
Domiciled in ▶_____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a work made for hire is...

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound Recording and compilation of Sound Recording

**b**   NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
- ☐ Yes
- ☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
Domiciled in ▶_____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
- ☐ Yes
- ☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
Domiciled in ▶_____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3  a**   YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.   1997 ◄ Year

**b**   DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ 10    Day ▶ 28    Year ▶ 97
USA ◄ Nation

---

**4**   COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Lil' Joe Records
6157 N.W 167th Street, F-17
Miami, FL. 33015

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
JAN 05 1998
ONE DEPOSIT RECEIVED
JAN 05 1998
TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE OFFICE USE ONLY

---

MORE ON BACK ▶   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.          • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

# EXHIBIT O

# CERTIFICATE OF REGISTRATION

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

FORM SR
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**SR 327-778**

EFFECTIVE DATE OF REGISTRATION

FEB 26, 2001
Month    Day    Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**
**TITLE OF THIS WORK ▼**

SPORTS WEEKEND AS NASTY AS THEY WANNA BE PART 2 (XR-116)

**PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼**

**2**
**a**
**NAME OF AUTHOR ▼**

LUKE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ⎰ Citizen of ▶ USA
   ⎱ Domiciled in ▶ USA

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound Recording

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**
**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ⎰ Citizen of ▶
   ⎱ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**
**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ⎰ Citizen of ▶
   ⎱ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**
**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**
1991 ◀ Year
This information must be given in all cases.

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶ 9    Day ▶ 1    Year ▶ 1991
USA ◀ Nation

**4**
**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 N.W. 167th STREET, F-17
MIAMI, FLORIDA 33015

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED
NOV 0 8 2002
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
FEB 26, 2001
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

# EXHIBIT P

# CERTIFICATE OF REGISTRATION



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS

*United States of America*

**FORM SR**
**United States COPYRIGHT OFFICE**

**REGISTRATION NUMBER**



**SR 327-789**

EFFECTIVE DATE OF REGISTRATION

FEB 26, 2001

Month | Day | Year

OFFICIAL SEAL . . . . DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** **TITLE OF THIS WORK ▼**

BANNED IN THE U.S.A.   (XR-114)

**PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼**

**2**

**a** **NAME OF AUTHOR ▼**

LUKE RECORDS, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

Sound Recording

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**
1990 ◀ Year
This information must be given in all cases.

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶ 7   Day ▶ 24   Year ▶ 1990
USA                              ◀ Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 N.W. 167th STREET,   F-17
MIAMI, FLORIDA 33015

**APPLICATION RECEIVED**
NOV 08 2002
**ONE DEPOSIT RECEIVED**

**TWO DEPOSITS RECEIVED**
FEB 26, 2001
**FUNDS RECEIVED**

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

See instructions before completing this space.

DO NOT WRITE HERE
OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

# EXHIBIT Q

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**SR 353-540**

*SR000353540*

II SM            SRU

**EFFECTIVE DATE OF REGISTRATION**

**FEB 26, 2001**
Month        Day        Year

EPARATE CONTINUATION SHEET.

---

**1**

TITLE OF THIS WORK ▼

AS NASTY AS THEY WANNA BE (XR-107)

PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼

---

**2**

**a** NAME OF AUTHOR ▼

LUKE RECORDS, INC.

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶ USA

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?     ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound Recording

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?     ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?     ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
1989 ◀ Year in all cases.
This information must be given

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ 5   Day ▶ 1   Year ▶ 1989
USA ◀ Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

LIL' JOE RECORDS, INC.
6157 N.W. 167th STREET, F-17
MIAMI, FLORIDA 33015

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

BY WRITTEN AGREEMENT

APPLICATION RECEIVED
NOV 08 2002
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
FEB 26, 2001
FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

# EXHIBIT R

dj mr mixx | Search

Home    Videos    Channels    Shows

Create Account   or   Sign In

Subscriptions    History    Upload

**DJ MR MIXX BOOKING VIDEO**



 dhobbs2live
July 09, 2009
(more info)

Subscribe

BOOK DJ MR MIXX NOW..... email:
mixx808king@yahoo.com or call 305 926 7194

URL  http://www.youtube.com/watch?v=rDfHSowG

Embed  <object width="425" height="344"><param na

### More From: dhobbs2live

### Related Videos

 **DJ MR MIXX SCRATCH ARCHIVE DOUBLE DUTCH**
7,430 views
dhobbs2live

 **Eko Fresh & DJ Mr. Mixx - Booty**
350 views
alexanderhlebino

 **DJ MR MIXX SCRATCH ARCHIVES 1 PRACTICE**
1,705 views
dhobbs2live

 **ATZEN MUSIK ab JULI 09 im RIU PALACE Mallorca L....**
61,795 views
atzenmusiktv

 **YOUNG JEEZY GANGSTA SCRATCH REMIX**
3,315 views
dhobbs2live

**DJ OBAMA DROP**
891 views
dhobbs2live

**N.W.A. Drink it up**
20,281 views
MRJARDIM

▶  ═══════════════════●══  9:10 / 9:59  🔊 📺 360p ▾  ⤢ ⛶

6 ratings                                              422 views

Favorite   Share   Playlists   Flag

Facebook        Twitter        MySpace                (more share options)

Statistics & Data

Video Responses (0)                    Sign in to post a Video Response

Text Comments (5)   Options           Sign in to post a Comment

**techknign** (2 months ago)                    Reply   0
Mr. Mixx whats good i'm glad to see you still doin your thang ! Question are you
still producing get back to me

**BOBBYBLENDZ** (6 months ago)                  Reply   +1
man, u did this set at the new music seminar too, right?

**BOBBYBLENDZ** (6 months ago)
*Comment removed by author*

**dell1972** (7 months ago)                      Reply   0
THE BEST THAT EVER DID IT!

**djneedlz** (7 months ago)                      Reply   0
mr. mixx on the mix,,,

Showing 5 of 5 comments        Show More Comments        View All 5 comments

**Would you like to comment?**
Join YouTube for a free account, or sign in if you are already a member.

Try YouTube in a fast, new web browser! Download Google Chrome for PC

### Featured Videos

2:42          4:56          8:45
**Report: Baby    J-Wowws      BEST BIG
Skull Jewelry    Boobs are as  BROTHER
...            ...           ...**
65,859 views    1,779,650 views 237,929 views
TheOnion        sxephil        SHAYTARDS

Help    About    Safety    Privacy    Terms    Copyright    Partners    Developers    Advertising

Language: English    Location: Worldwide    Safety mode: Off

YouTube - DJ MR MIXX BOOKING VIDEO                                                    Page 1 of 1

| dj mr mixx | Search |

Home   Videos   Channels   Shows

Create Account   or   Sign In

Subscriptions   History   Upload

**DJ MR MIXX BOOKING VIDEO**



► ⬤ 9:08 / 9:59 ◄)) 360p ⚙ ↻ ⛶

6 ratings                                                                          422 views

**dhobbs2live**
July 09, 2009
(more info)                                                    Subscribe

BOOK DJ MR MIXX NOW..... email:
mixx808king@yahoo.com or call 305 926 7194

URL   http://www.youtube.com/watch?v=rDfHSowG

Embed   <object width="425" height="344"><param na

**More From: dhobbs2live**

**Related Videos**



DJ MR MIXX SCRATCH
ARCHIVE DOUBLE DUTCH
7,430 views
dhobbs2live



Eko Fresh & DJ Mr. Mixx -
Booty
350 views
alexanderhlebino



DJ MR MIXX SCRATCH
ARCHIVES 1 PRACTICE
1,795 views
dhobbs2live



ATZEN MUSIK ab JULI 09 im
RIU PALACE Mallorca L...
61,795 views
atzenmusiktv

YOUNG JEEZY GANGSTA
SCRATCH REMIX
3,315 views
dhobbs2live



DJ OBAMA DROP
891 views
dhobbs2live

N.W.A. Drink it up
20,281 views
MRJARDIM

**Featured Videos**

Favorite   Share   Playlists   Flag

Facebook        Twitter              MySpace                    (more share options)

**Statistics & Data**

**Video Responses** (0)                              Sign in to post a Video Response

**Text Comments** (5)   Options                      Sign in to post a Comment

**techknign** (2 months ago)                                                     Reply    0
Mr. Mixx whats good i'm glad to see you still doin your thang ! Question are you
still producing get back to me

**BOBBYBLENDZ** (6 months ago)                                                   Reply   +1
man, u did this set at the new music seminar too, right?

**BOBBYBLENDZ** (6 months ago)
*Comment removed by author*

**dell1972** (7 months ago)                                                      Reply    0
THE BEST THAT EVER DID IT!

**djneedlz** (7 months ago)                                                      Reply    0
mr. mixx on the mix,,,

Showing 5 of 5 comments        Show More Comments        View All 5 comments

**Would you like to comment?**
Join YouTube for a free account, or sign in if you are already a member.

Try YouTube in a fast, new web browser! **Download Google Chrome for PC**

Report: Baby        J-Wowws        BEST BIG
Skull Jewelry       Boobs are as   BROTHER
2:42                4:56            8:45
69,859 views        1,779,650 views 237,829 views
TheOnion            sxephil        SHAYTARDS

Help   About   Safety   Privacy   Terms   Copyright   Partners   Developers   Advertising

Language: English   Location: Worldwide   Safety mode: Off

# EXHIBIT S



WWW.HATERRADIOFM.COM
WWW.OFFICIAL2LIVECREW.COM
WWW.MYSPACE.COM/UNDENIABLEJTMONEY



# EXHIBIT T

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Mar 23 04:00:27 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: _____   OR   Jump   to record: _____   **Record 2 out of 3**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | THE **2 LIVE CREW** |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: series of prerecorded compact discs, audio tapes, phonograph records and video tapes featuring explicit rap music. FIRST USE: 19850308. FIRST USE IN COMMERCE: 19850308 |
| | IC 041. US 100 101 107. G & S: entertainment services, namely, a musical performance group performing live performances. FIRST USE: 19840600. FIRST USE IN COMMERCE: 19840600 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74653484 |
| **Filing Date** | March 29, 1995 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | August 13, 1996 |
| **Registration Number** | 2013177 |
| **Registration Date** | November 5, 1996 |
| **Owner** | (REGISTRANT) Won, Christopher Wong INDIVIDUAL TRINIDAD/TOBAGO 901 N.W. 203 Street Miami FLORIDA 33169 |
| | (LAST LISTED OWNER) LIL' JOE RECORDS, INC. CORPORATION BY ASSIGNMENT, BY ASSIGNMENT, BY ASSIGNMENT, BY ASSIGNMENT FLORIDA 6157 N.W. 167TH STREET, SUITE F-17 MIAMI FLORIDA 33015 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |

| | |
|---|---|
| **Attorney of Record** | DEBORAH TELLERMAN BERKOWITZ |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20060911. |
| **Renewal** | 1ST RENEWAL 20060911 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY